

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-4-1996

# United States v. Edmonds

Precedential or Non-Precedential:

Docket 93-1890

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Edmonds" (1996). *1996 Decisions.* Paper 190.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/190

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 93-1890
_____

UNITED STATES OF AMERICA

v.

THEODORE EDMONDS,

Appellant
_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Criminal No. 92-cr-00504-1)
_____

Argued: October 24, 1994

Before:  STAPLETON, HUTCHINSON, and GARTH,
Circuit Judges.

(Opinion Filed: April 18, 1995; vacated June 29, 1995)
_____

Reargued In Banc: October 25, 1995

Before:  SLOVITER, Chief Judge, BECKER, STAPLETON,
MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD, ALITO,
ROTH, LEWIS, McKEE, SAROKIN, and GARTH
Circuit Judges.
_____

(Filed April 4, 1996)

MICHAEL R. STILES, ESQUIRE (ARGUED)
United States Attorney
WALTER S. BATTY, JR., ESQUIRE
Assistant United States Attorney
JEFFREY W. WHITT, ESQUIRE
Assistant United States Attorney
VALLI F. BALDASSANO, ESQUIRE
Assistant United States Attorney

615 Chestnut Street
Philadelphia, PA   19106

1

Counsel for Appellee
DOMNICK J. SORISE, ESQUIRE (ARGUED)
33830 Harper
Clinton Township, MI    48035

Counsel for Appellant

---

OPINION OF THE COURT

---

BECKER, Circuit Judge.

A federal jury convicted appellant Theodore Edmonds of violating the Continuing Criminal Enterprise statute ("CCE"), 21 U.S.C. § 848, which makes it a crime to organize, supervise, or manage five or more persons in a "continuing series of violations" of the federal narcotics laws. Edmonds argues that the district court erred in failing to instruct the jurors that, in order to convict, they must agree unanimously on which violations -- of the eight alleged -- constituted the three related violations necessary to establish a "continuing series."

In United States v. Echeverri, 854 F.2d 638 (3d Cir. 1988), we held that the CCE statute requires jury unanimity as to the identity of each of the three related violations comprising the continuing series. This in banc[1] rehearing gives us the opportunity to reconsider Echeverri. The question of the degree of jury unanimity required by the CCE statute is a difficult one, and other courts of appeals have disagreed with Echeverri's

---

[1] This may be one of this court's last "in banc" opinions. Until recently, we have eschewed the more common "en banc" spelling in favor of the latin form. However, a proposed amendment to the Federal Rules of Appellate Procedure adopts the "en banc" spelling. See Fed R. App. P. 35 (Preliminary Draft of Proposed Amendment September 1995).

resolution, see, e.g., United States v. Canino, 949 F.2d 928 (7th Cir. 1991), cert. denied, 504 U.S. 910, and cert. denied sub nom. Flynn v. United States, 503 U.S. 996 (1992). Nevertheless, guided by historical tradition in criminal jurisprudence, constitutional considerations, and the rule of lenity, we reaffirm Echeverri and hold that the CCE statute requires juror unanimity as to the identity of the related violations comprising the continuing series.

In view of this holding, we must also decide whether the district court's failure to give the proper unanimity instruction was harmless error. This task requires us to examine the scope of Sullivan v. Louisiana, 113 S. Ct. 2078 (1993), which held that an erroneous reasonable doubt instruction cannot be harmless because such error undermines an essential premise of harmless error analysis -- the existence of an actual verdict of guilty beyond a reasonable doubt. Id. at 2082.

We conclude that Sullivan does not preclude harmless error analysis in this case. Unlike the verdict in Sullivan, in which an erroneous reasonable doubt instruction undermined all of the jury's findings, the jury in this case delivered valid findings on essentially all of the elements of the offense by convicting Edmonds of every violation alleged to constitute the continuing series. These convictions do not themselves show unanimous agreement that the same three violations were sufficiently related to each other to constitute a continuing series. However, the evidence that the jury must have credited to find Edmonds guilty of the predicate violations unequivocally

3

established that all charged violations were related.  In such circumstances, no rational jury could unanimously find Edmonds guilty of the predicate offenses without unanimously finding that the offenses were related to each other.  We thus affirm Edmonds's conviction.

## I. Facts and Procedural History

The facts of this case are fully set out in the earlier panel opinion, see United States v. Edmonds, 52 F.3d 1236, 1241 (3d Cir.), vacated in part, 52 F.3d 1251 (3d Cir. 1995); thus, we provide only a brief summary.  The evidence at trial showed that Edmonds led a nationwide cocaine and heroin distribution network.  The organization was based in Los Angeles, California and sold drugs to distributors for resale in various locales, including Chester, and Philadelphia, Pennsylvania; Wilmington, Delaware; Wilmington, North Carolina; Detroit, Michigan; New Orleans, Louisiana; and Toledo, Ohio.

A federal grand jury returned a twenty-seven count indictment against Edmonds and eleven other people.  The indictment charged Edmonds with conspiracy to distribute cocaine and heroin in violation of 21 U.S.C. § 846; distribution of heroin and aiding and abetting distribution in violation of 21 U.S.C. §841(a)(1); two counts of distribution of cocaine and aiding and abetting distribution in violation of 21 U.S.C. §841(a)(1); three counts of unlawful use of a communications facility in violation of 21 U.S.C. § 243(b); and four counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) &

4

(2).  In addition, the indictment charged Edmonds with engaging in a CCE in violation of 21 U.S.C. § 848.  The CCE count identified eight predicate offenses:  the conspiracy count, the three distribution counts, the three communications facility counts, and one of the money laundering counts.[2]

At trial, the district court gave the following instruction concerning the CCE charge:

> So the Government has to prove that he [Edmonds] committed a felony in violation of narcotics laws; i.e.[,] that in some way he was causing or attempting to cause the distribution of cocaine and heroin as charged in Count 1 of the indictment or in other counts charged in the indictment.
>
> The Government has to prove secondly that such violation was part of a continuing series of related violations of the federal narcotics laws.  A continuing series of violations requires proof beyond a reasonable doubt that three or more violations of the laws occurred and that they, those three or more, were related to each other.

App. 577.  The court rejected Edmonds's request that it explain to the jurors that they must unanimously agree on which three related violations occurred.  Instead, the court gave only general unanimity instructions.  See, e.g., App. 581 ("You are asked to deliberate with a view towards reaching a unanimous decision with respect to each count and each defendant charged

---

[2] The indictment's inclusion of the money laundering offense, 18 U.S.C. § 1956, as a CCE predicate offense appears to be in error. See 21 U.S.C. § 848(c) (defining CCE predicate offenses as violations of U.S. Code Title 21, Chapter 13, subchapter I or II). However, Edmonds has not raised this issue, and we thus deem it waived.

here in this indictment."). The jury convicted Edmonds of all counts.

A panel of this Court reversed Edmonds's CCE conviction. The panel's decision was based on United States v. Echeverri, which held that a district court's refusal to give a specific unanimity instruction in a CCE trial is reversible error. See Echeverri, 854 F.2d at 643. The panel found Echeverri controlling despite a significant difference between the two cases. In Echeverri, the government had introduced evidence of a plethora of drug-related activity to establish the continuing series, and, because the jury did not hand down verdicts on the separate predicate offenses, it was unclear whether the jury agreed that the same three predicate violations occurred. See id. at 642-43. In contrast, Edmonds's jury convicted him of each of the narcotics violations alleged to constitute the continuing series, and hence it must have unanimously agreed that Edmonds committed every violation in the alleged series. Nevertheless, the panel found Echeverri controlling because the jury may not have agreed on which three offenses were related to each other. For example, six jurors may have felt that violations A,B, & C (but no others) were related, and the other six jurors may have concluded that violations D, E, & F (but no others) were related. See Edmonds, 52 F.3d at 1241.

The panel then held that harmless error analysis was inapplicable. Although the evidence that the jury must have believed to find Edmonds guilty of the predicate offenses also established a single ongoing scheme, the panel reasoned that

6

<u>Sullivan v. Louisiana</u>, 113 S. Ct. 2078 (1993), barred it from engaging in harmless error analysis. <u>Sullivan</u> held that a constitutionally deficient reasonable doubt instruction cannot be harmless because the error precludes the existence of a guilty verdict upon which harmless error scrutiny could operate. <u>Id.</u> at 2082.[3] Analogizing lack of jury unanimity to an unconstitutional definition of reasonable doubt, the panel held that "there has been no actual jury finding of guilty on the CCE charge," and thus that it could not rule that the error was harmless. <u>Edmonds</u>, 52 F.3d at 1244.

The government petitioned for rehearing, arguing that <u>Schad v. Arizona</u>, 501 U.S. 624 (1991), and <u>United States v. Jackson</u>, 879 F.2d 85 (3d Cir. 1989), have undermined <u>Echeverri</u>'s specific unanimity holding; the government also attacked the panel's harmless error analysis. We granted the petition and reheard the case <u>in banc</u>.

### II. The CCE Statute & Specific Juror Unanimity

To convict a defendant under the CCE statute, the government must prove: (1) that the defendant committed a felony violation of a provision of United States Code Title 21, Chapter 13, subchapter I or II (various drug offenses); (2) that this violation was part of a "continuing series" of violations of these subchapters; (3) that the defendant, in committing the

---

[3] In <u>Sullivan</u>, the trial judge gave a definition of reasonable doubt virtually identical to one held unconstitutional in <u>Cage v. Louisiana</u>, 498 U.S. 39, 111 (1990) (per curiam).

7

continuing series of violations, acted as an organizer, supervisor, or manager of five or more other persons; and (4) that the defendant obtained "substantial income or resources" from such activities.[4]

Only the second requirement -- that the defendant committed a felony as part of a continuing series of violations -- is at issue in this appeal. We have held, as have most courts of appeals, that a "series" consists of at least three predicate violations. See Echeverri, 854 F.2d at 643; see also, e.g., United States v. Hernandez-Escarsega, 886 F.2d 1560, 1570 (9th

---

[4] In relevant part, 21 U.S.C. § 848 states:

> [A] person is engaged in a continuing criminal enterprise if --
>
> > (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
> >
> > (2) such violation is part of a continuing series of violations of this subchapter or subchapter II of this chapter --
> >
> > > (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
> > >
> > > (B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c).

Cir. 1989), cert. denied, 497 U.S. 1003 (1990); United States v. Young, 745 F.2d 733, 747 (2d Cir. 1984), cert. denied sub nom. Myers v. United States, 470 U.S. 1084 (1985). But see United States v. Baker, 905 F.2d 1100, 1102–05 (7th Cir. 1990) (requiring only two predicate offenses), cert. denied, 498 U.S. 876, and cert. denied sub nom. Manns v. United States, 498 U.S. 904 (1990). Furthermore, because the series must be "continuing," the three predicate offenses must be related to each other in some way. See, e.g., United States v. Jones, 801 F.2d 304, 307 (8th Cir. 1986); Baker, 905 F.2d at 1104.

As we have explained, the critical question is whether the jury need unanimously agree only that the defendant committed three related violations or whether, instead, the jury must unanimously agree that the same three related violations occurred. Although it is well settled that a defendant in a federal criminal trial has a constitutional right to a unanimous verdict, see, e.g., Andres v. United States, 333 U.S. 740, 748–49 (1948); Patton v. United States, 281 U.S. 276, 288–90 (1930); see also Fed. R. Crim. P. 31(a), the level of factual specificity on which the jury must be unanimous is far from clear. In Schad v. Arizona, 501 U.S. 624 (1991), a plurality of the Supreme Court shed some light on this question. Schad indicates that the scope of jury unanimity is primarily a question of legislative intent, although due process limits the legislature's definitional power.

Following Schad, we view the CCE unanimity question principally in terms of congressional intent. We recognize that, on its face, the CCE statute gives little indication of

9

Congress's intent with respect to jury unanimity. Nevertheless, guided by historical tradition, constitutional considerations, and the rule of lenity, we conclude that a statute combining formerly separate crimes -- crimes that may take place at different times and at different places -- should generally be read to require unanimity as to each predicate offense. Here, because there is no indication of intent to the contrary, we hold that in order to convict a defendant under the CCE statute, the jury must unanimously agree that the same three related predicate offenses occurred.

## A. The Analytic Framework

In <u>Schad v. Arizona</u>, 501 U.S. 624 (1991), a four-Justice plurality concluded that when a statute enumerates alternative routes for its violation, whether jurors must be unanimous with respect to a particular route depends on two questions. First, did the legislature intend the different routes to establish separate "offenses," for which unanimity is required as to every fact constituting the offense, or different "means" of violating a single offense, for which unanimity is not required? Second, if the legislature intended the alternative routes to be mere means of violating a single statute, is the statute's definition of the crime unconstitutional under the Due Process Clause?

Edward Harold Schad was convicted under an Arizona statute that defined first degree murder as "murder which is . . . wilful, deliberate or premeditated . . . or which is committed

10

. . . in the perpetration of, or attempt to perpetrate, . . . robbery." Id. at 628 (quoting Ariz. Rev. Stat. § 13-452 (supp. 1973)). At trial, the prosecutor advanced theories of both premeditated murder and felony murder, and the trial court gave only a general unanimity instruction (i.e., that all jurors must agree on whether the defendant is guilty or not guilty). On appeal, Schad argued that the state trial court had erred in not requiring the jury to agree on a single theory of first degree murder. The Arizona Supreme Court affirmed Schad's conviction, stating, "In Arizona, first degree murder is only one crime regardless whether it occurs as a premeditated murder or a felony murder. . . . [T]he defendant is not entitled to a unanimous verdict on the manner in which the act was committed." Id. at 629 (plurality opinion) (quoting State v. Schad, 788 P.2d 1162, 1168 (Ariz. 1989)).

A divided United States Supreme Court affirmed the Arizona Supreme Court's judgment. In an opinion joined by Chief Justice Rehnquist and Justices O'Connor and Kennedy, Justice Souter analyzed the problem in terms of due process limits on the legislature's power to define criminal conduct, and not as a jury unanimity issue. Id. at 630-31 (plurality opinion).[5] Because the Arizona Supreme Court, the final interpreter of Arizona law, had held that felony murder and premeditation were merely different "means" of committing a single "offense," the intent of

---

[5] Justice Scalia joined part of Justice Souter's opinion, not relevant to this case, dealing with the right to have the jury instructed on a lesser included offense in capital cases.

11

the Arizona legislature had been conclusively established, and Schad's jury was unanimous on all the facts necessary to establish the offense. See Schad, 501 U.S. at 630-31. Thus, it was unnecessary to decide whether a criminal defendant has a right to a unanimous verdict in a state capital case.[6]

The remaining issue was whether Arizona's definition of the crime is constitutional under the Due Process Clause. The plurality concluded -- and Justice Scalia seemed to agree -- that due process limits the legislature's "capacity to define different courses of conduct . . . as merely alternative means of committing a single offense, thereby permitting a defendant's conviction without jury agreement as to which course . . . actually occurred." Id. at 632 (plurality opinion); see also id. at 650-52 (Scalia, J., concurring in the judgment) (recognizing due process limitation).

The plurality described this due process concern as analogous to vagueness:

> The axiomatic requirement of due process that
> a statute may not forbid conduct in terms so
> vague that people of common intelligence
> would be relegated to different guesses about
> its meaning carries the practical consequence
> that a defendant charged under a valid
> statute will be in a position to understand
> with some specificity the legal basis of the
> charge against him. Thus it is an assumption
> of our system of criminal justice "'so rooted
> in the traditions and conscience of our

---

[6] Although the Sixth Amendment requires a unanimous verdict in federal criminal trials, it does not so require in state trials. See Johnson v. Louisiana, 406 U.S. 356 (1972); Apodaca v. Oregon, 406 U.S. 404 (1972). In Schad, Schad argued that the Sixth, Eighth, and Fourteenth Amendments require a unanimous jury in state capital cases. As mentioned, the Court did not reach this question.

12

> people as to be ranked as fundamental,'" that
> no person may be punished criminally save
> upon proof of some specific illegal conduct.
> Just as the requisite specificity of the
> charge may not be compromised by the joining
> of separate offenses, nothing in our history
> suggests that the Due Process Clause would
> permit a State to convict anyone under a
> charge of "Crime" so generic that any
> combination of jury findings of embezzlement,
> reckless driving, murder, burglary, tax
> evasion, or littering, would suffice for
> conviction.

Id. at 632–33 (plurality opinion) (citations and footnote omitted).

The plurality's due process test looked to "history and wide practice as guides to fundamental values, as well as to narrower analytic methods of testing the moral and practical equivalence" of alternative means of satisfying an element of an offense. Id. at 637. Finding ample historical evidence that murder has been defined as killing another with "malice aforethought" (of which the intent to kill and the intent to commit a felony were alternative aspects), that a significant number of other states defined murder in the same way that Arizona did, and that a moral equivalence between the two means could be found on the facts of the case, Justice Souter concluded that the Arizona statute was constitutional.

Concurring in the judgment, Justice Scalia agreed that the statute at issue was constitutional under the Due Process Clause, but disagreed as to the appropriate constitutional test. He argued that due process is defined solely in terms of historical practice, at least when the procedure at issue has historical roots. See id. at 650 (Scalia, J., concurring in the

13

judgment).  Because of the ample historical evidence cited by the plurality, Justice Scalia agreed with its judgment.  <u>Id.</u> at 651.

Justice White dissented in an opinion joined by Justices Marshall, Blackmun, and Stevens.  Grounding his analysis in <u>In re Winship</u>, 397 U.S. 358, 364 (1970), which requires "proof beyond a reasonable of every fact necessary to constitute the crime," Justice White opined that the verdict at issue provided "no clues whether the jury agrees that the three elements of premeditated murder or the two elements of felony murder have been proved beyond a reasonable doubt."  <u>Schad</u>, 501 U.S. at 655 (White, J., dissenting).

## B. The Analysis Applied to the CCE Statute

Unlike the Supreme Court in <u>Schad</u>, which was bound by the Arizona Supreme Court's interpretation of state law, we must interpret the CCE statute.  In relevant part, 21 U.S.C. § 848 provides:

> [A] person is engaged in a continuing criminal enterprise if --
>
> (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
>
> (2) such violation is part of a continuing series of violations of this subchapter or subchapter II of this chapter --

21 U.S.C. § 848(c).  In the language of <u>Schad</u>, the question is whether the menu of predicate violations specified by subchapters

14

I and II are different "means" or different "offenses."[7]  In other words, do the provisions represent various ways to commit the CCE crime, like shooting, drowning, etc. for a murder statute?  Or do they represent different crimes themselves, such that the jury must agree which particular related violations were committed?[8]

[7] Our inquiry is not, as Judge Alito suggests, whether Congress intended to include "a special jury-unanimity requirement." Rather, we must determine, as we do with all statutes, what level of unanimity Congress intended.  In Schad's terms, the question is whether Congress intended a given fact to be an "element." When a legislature enacts a statute, the legislature determines that certain facts are "elements," i.e., that they are "indispensable to proof of a given offense."  Schad, 501 U.S. at 633 (plurality opinion).  The characterization of a fact as an "element" then carries the consequence that the jury must agree that the fact occurred in order to convict.  See, e.g., id. at 639 ("The essence of petitioner's argument is that, despite [the Arizona Supreme Court's] unitary definition of the offense, each of these means must be treated as an independent element as to which the jury must agree . . . .").

When the object of our statutory interpretation inquiry is correctly identified, Judge Alito's criticisms fall short.  That Congress has not generally adopted "special unanimity requirements" or that Congress can be explicit when it wants "special unanimity requirements" is immaterial.  Congress determines "elements," and hence, what facts require unanimous jury agreement, every time it passes a criminal statute.  For example, we would not allow a conviction to stand for murder under 18 U.S.C. § 1111 without unanimous agreement that someone was killed.  Congress has made the unlawful killing of a human being an "element" for which unanimity is required.  (Of course, the present inquiry is more difficult than this example, because we must inquire whether the CCE statute creates more than one offense, see infra note 8, each with its own elements).

[8] The Schad plurality recognized that a single statute offering alternative routes of violation may create multiple offenses for which unanimity is required.  For example, in rejecting the dissent's mode of analysis, the plurality stated:

In the dissent's view, whenever a statute lists alternative means of committing a crime, "the jury [must] indicate on which of the alternatives it has based the defendant's guilt," even where there is no

15

The statute lends itself to either interpretation.  On the one hand, the statute is triggered by violation of "<u>any</u> provision" as part of a "continuing <u>series</u> of violations."  By placing no emphasis on the particular, the statute could be read to say that different routes of violation are fungible alternatives, suggesting that the provisions are mere "means."

On the other hand, the different ways of violating the CCE statute are themselves separate offenses defined in the United States Code.  The predicate violations are things which, by definition, Congress views as separate offenses.  <u>Cf.</u> <u>Babb v. United States</u>, 218 F.2d 538, 539-40 & n.3 (5th Cir. 1955) ("The statute under which this prosecution is lodged [18 U.S.C. § 545] defines two separate types of offenses [because] [t]he first

---

indication that the statute seeks to create separate crimes.  This approach rests on the erroneous assumption that any statutory alternatives are ipso facto independent elements defining independent crimes under state law, and therefore subject to the axiomatic principle that the prosecution must prove independently every element of the crime.  In point of fact, . . . legislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes. The question whether statutory alternatives constitute independent elements of the offense therefore does not, as the dissent would have it, call for a mere tautology; rather it is a substantial question of statutory construction.

<u>Schad</u> 501 U.S. at 635-36 (plurality opinion) (footnotes and citations omitted).  The plurality's statement that "legislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes" implies that the plurality believes legislatures sometimes do intend to define separate crimes when they enumerate alternative ways of committing a crime.

paragraph . . . was derived from 19 U.S.C. §1593(a), which in turn had as its source R.S. § 2865 . . . . [and] [t]he second paragraph . . . was derived from 19 U.S.C. §1593(b), which in turn had as its source R.S. § 3082."). Thus, we find the language of the statute inconclusive.[9]

Legislative history also provides little help here. Neither party cited any legislative history, and our own research failed to turn up any probative evidence. Indeed, the opaqueness of the "continuing series" requirement was a matter of concern to some members of Congress. See H.R. Rep. No. 1444, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 4566, 4651 (stating "additional views" of some committee members that "it is not at all clear what constitutes a 'continuing series of violations'").

At least one circuit -- the Seventh -- has argued that the purpose of the CCE statute sheds light on Congress's intent.
> The point of the CCE statute is to impose special
> punishment on those who organize and direct a

---

[9] If the correct statutory analysis is used (i.e., whether Congress intended the different alternatives of violating the CCE statute to constitute separate "offenses"), Judge Alito's argument that the CCE statute is unambiguous is not tenable. The alternatives at issue here -- "violat[ions of] any provision of this subchapter or subchapter II of this chapter" -- are themselves defined as separate crimes. It is far from clear whether Congress intended these alternatives to lose their status as separate offenses when then they were incorporated by reference into a new statute.

Judge Alito's dispute with our statutory analysis is really a dispute over the appropriate default rule for interpreting congressional silence. He criticizes us for failing to anchor our analysis in the text or legislative history of the CCE statute, but he cites no text or legislative history in support of his view that CCE predicate offenses are not "elements" for which unanimity is required. The reason for both our omissions is sound; the statute is simply silent on this issue.

17

significant number of larger scale drug transactions; the exact specification by unanimous jury consent of any particular three . . . offenses is irrelevant to any theory about why punishment should be enhanced for such uniquely antisocial activity.

United States v. Canino, 949 F.2d 928, 948 (7th Cir. 1991).  We think this argument proves too much:  the punitive purpose of a criminal statute will never be served by providing more procedural protections to the defendant.  Furthermore, even a more nuanced inquiry into a statute's purpose is unlikely to provide insight.  A statute's broad goal says little about whether different acts falling within the statute are means or offenses, or about the requisite degree of jury agreement.

Although we are skeptical that the first prong of the Schad analysis -- examining whether the legislature, in enumerating alternatives, intended to create a single or multiple offenses -- has much predictive force, we must perforce attempt to work with Schad.[10]  In doing so, we acknowledge that the CCE statute offers little explicit guidance on Congress's intent.  We therefore turn to several background interpretive principles, which, we conclude, establish that Congress did intend to require jury unanimity as to the CCE predicate offenses.[11]

---

[10] Arguably, rather than looking to the legislature's intent, it would be preferable to ask, in the first instance, whether differences between statutory alternatives are so important that the lack of jury agreement as to a specific alternative casts too much doubt on the accuracy of the verdict.  See Scott W. Howe, Jury Fact-Finding in Criminal Cases, 58 Mo. L. Rev. 1 (1993). Hopefully, the Supreme Court will revisit this question soon.
[11] We use the phrase "jury unanimity as to the CCE predicate offenses" to mean jury agreement on both the identity and relatedness of the three offenses.

18

### 1. Background Interpretive Principles

### a. Tradition in Criminal Jurisprudence

We look first to general historical tradition in criminal jurisprudence. Criminal trials have long ensured substantial jury agreement as to the facts establishing the offense. This is because criminal statutes and the common law have generally defined crimes in terms of conduct (and accompanying mental state) that takes place in a single place at some specific time. For example, murder statutes require that the defendant killed some other person, an act occurring in some specified time and place. Thus, when a jury delivers a general guilty verdict for such a crime, we are confident that the jury agreed on most of the actions engaged in by the defendant. When there is a real risk that a jury will convict without agreement on a discrete set of actions, courts have required specific unanimity instructions. See, e.g., United States v. Holley, 942 F.2d 916, 928-29 (5th Cir. 1991) (reversing a conviction for perjury because the district court's instructions allowed the jury to convict without agreement as to a particular false statement), cert. denied, 114 S. Ct. 77 (1993). In our view, substantial agreement on a discrete set of actions is essential to ensure that the defendant is guilty beyond a reasonable doubt of some specific illegal conduct. See Howe, supra n.10.

In the face of this tradition, we cannot read from Congress's silence that it intended CCE predicate offenses to constitute mere means of violating a single CCE offense. To do so would allow conviction on jury agreement merely that the

19

defendant committed some three violations of United States Code Title 21, Chapter 13, subchapters I and II, even when it is alleged that the defendant committed many different acts occurring at different times and places.  This is a wholly different situation from the one at issue in Schad.  Indeed, as Justice Scalia pointed out in criticizing the plurality's moral equivalence test of constitutionality, "We would not permit, for example, an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday, despite the 'moral equivalence' of those two acts."  Schad, 501 U.S. at 651 (Scalia, J., concurring in the judgment).[12]

### b. Constitutional Considerations

Constitutional considerations also guide our analysis. There is a real possibility that the CCE statute would violate the Due Process Clause absent a specific unanimity requirement. See Eric S. Miller, Note, Compound-Complex Criminal Statutes and the Constitution:  Demanding Unanimity as to Predicate Acts, 104 Yale L.J. 2277 (1995).  "[W]here a statute is susceptible to two

---

[12] Judge Alito challenges our reading of history, arguing that it is not true (1) that the jury has always been required to "agree[] on most of the actions engaged in by the defendant"; nor (2) that the prosecution has always been required to establish the "specified time and place" where a charged offense occurred. But this response, which artificially atomizes our position, is fundamentally flawed.  Although each of Judge Alito's propositions is correct in isolation, the question is whether convictions have been allowed to stand where the jury disagrees on both (1) most of the defendant's actions; and (2) the time and place the crime occurred.  If the CCE predicate offenses are not elements upon which the jury must agree, that is what the CCE statute would allow.

constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [our] duty is to adopt the latter."  United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366 (1909).

Both the Schad plurality and Justice Scalia agree that due process is defined in part by historical practice.  As mentioned, interpreting predicate offenses as different means of violating a single continuing series element marks a departure from historical guarantees on the degree of factual agreement necessary to establish a conviction.  And, of course, on a more specific level, there is no historical analogue to the CCE statute.  The first complex criminal statutes like the CCE law appeared only in 1970.  See Miller, supra, at 2280 & nn. 12-14.[13] We recognize that "history [is] less useful as a yardstick in

_____

[13] Judge Garth asserts that the law of conspiracy provides a historical analogue to the continuing series requirement, because, he argues, a defendant can be convicted of conspiracy without jury agreement as to which object, of various objects alleged, forms the basis of the conspiracy.  We disagree.  First, we are skeptical of Judge Garth's premise.  At some point, different alleged conspiracy objects suggest such disparate fact patterns that jury agreement as to the precise object of the conspiracy is necessary to support conviction.  See United States v. Castro, 887 F.2d 988, 993 (9th Cir. 1989) ("A unanimity instruction as to the particular objects of a charged conspiracy is appropriate where it appears that a conviction might rest upon different jurors having found the existence of different facts . . . ."); accord United States v. Feldman, 853 F.2d 648, 653 (9th Cir. 1988), cert. denied, 489 U.S. 1030 (1989).  Second, even assuming Judge Garth's view of conspiracy law is correct, the object of a conspiracy -- the purpose of the conspiratorial agreement -- is hardly analogous to the continuing series requirement, which requires three completed acts (with accompanying mental states) that themselves constitute separate crimes.

21

cases dealing with modern statutory offenses lacking clear common law roots." Schad, 501 U.S. at 640 n.7 (plurality opinion). But to the extent history has any force, it counsels against interpreting CCE predicate violations as means, for which unanimity is not required.

Moreover, in addition to historical practice, the Schad plurality believed that due process requires that different means, for which unanimity is not required, must reflect notions of "equivalent blameworthiness or culpability." Schad, 501 U.S. at 643 (plurality opinion). If the predicate offenses are interpreted as means, we suspect that the CCE statute may have serious problems meeting this requirement. A violation of any provision of U.S. Code Title 21, Chapter 13, subchapter I or II can serve as a predicate offense. See 21 U.S.C. § 848(c). Predicate offenses thus range from simple possession of marijuana, 21 U.S.C. § 844, to the distribution of cocaine or heroin, 21 U.S.C. § 841. The disparate penalties imposed for different violations -- generally no more than a year in prison for the first-time offense of simple possession, see 21 U.S.C. §844(a), compared to a minimum of ten years in jail for distributing a large quantity of drugs, see 21 U.S.C. §841(b)(1)(A) -- cast serious doubt on whether different predicate offenses (at least these different offenses) can be characterized as equally blameworthy.[14] These potential

---

[14] The predicate offenses involved in this case do not pose the severe disparate culpability problem identified in the hypothetical above, and thus Edmonds is not in a position to challenge the CCE statute's constitutionality on this basis. See

22

constitutional problems -- both equivalent blameworthiness and lack of a historical analogue -- also lead us to interpret the CCE predicate violations as elements of different offenses, for which unanimity is required.

Judge Garth criticizes this analysis, because, in his view, Congress has "already determined" that different predicate offenses are equally blameworthy by making them alternative routes of violating the same statute. But this view fundamentally misunderstands the nature of the "equivalent blameworthiness" analysis. The Schad plurality's test is a check on the legislature's power: its purpose is to decide whether different routes of violating the same statute are so morally disparate that a legislature cannot constitutionally treat them as mere means. Thus, the mere fact that Congress has established alternative routes of violating the same statute shows only the need for the equivalent blameworthiness analysis; it cannot answer the question.

Judge Garth also suggests that the equivalent blameworthiness test is a pointless exercise: even if different predicate offenses are so morally disparate that a specific unanimity instruction is required, he argues, a defendant could still be convicted under the CCE statute for widely different offenses. While this argument points out another potential

---

Schad, 501 U.S. at 644 ("The question is whether felony murder may ever be treated as the equivalent of murder by deliberation, and in particular whether robbery murder as charged in this case may be treated as thus equivalent.") (emphasis added). However, the possibility of constitutional problems in other cases is an important consideration in our interpretive inquiry.

problem with the CCE statute -- one not at issue on this appeal -- it does not undermine the utility of the equivalent blameworthiness test.

### c. The Rule of Lenity

Finally, requiring specific unanimity is counseled by concerns underlying the rule of lenity. That rule -- requiring ambiguous criminal statutes to be construed in favor of the defendant -- is applied both to the scope of conduct covered by a criminal statute and to the extent of the penalties imposed. See, e.g., Bifulco v. United States, 447 U.S. 381, 387 (1980) ("In past cases the Court has made it clear that [the rule of lenity] applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose.") (citations omitted). According to the Supreme Court, the rule ensures "there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." Crandon v. United States, 494 U.S. 152, 158 (1990) (citing Liparota v. United States, 471 U.S. 419, 427 (1985); United States v. Bass, 404 U.S. 336, 347-48 (1971)).

The rule of lenity is not directly applicable to the question whether a single statute creates multiple offenses for purposes of jury unanimity. However, the rule has been applied to a conceptually analogous situation: whether a single criminal act constitutes one or more violations of a statute. See Ladner v. United States, 358 U.S. 169 (1958) (a single discharge of a shotgun wounding two federal officers constitutes a single

24

violation of 18 U.S.C. § 254 (1940)); <u>Bell v. United States</u>, 349 U.S. 81 (1955) (transporting two women across states lines constitutes a single violation of the Mann Act); <u>United States v. Universal C.I.T. Credit Corp.</u>, 344 U.S. 218 (1952) (each breach of Fair Labor Standards Act duty to a single employee in any single workweek does not constitute a separate offense).

Moreover, the principles motivating the rule have considerable force here. Several cases -- those addressing the penalties a defendant will receive -- suggest that people deserve warning not only of the boundaries of criminal conduct, but also of the <u>repercussions</u> of crossing those boundaries. For example, in <u>United States v. Granderson</u>, 114 S. Ct. 1259, 1261 (1994), the Court addressed the meaning of "the original sentence" in a statute providing that if a person serving a sentence of probation possesses illegal drugs, "the court shall revoke the sentence of probation and sentence the defendant to not less than one-third of the <u>original sentence</u>." 114 S. Ct. 1259, 1261 (1994) (quoting 18 U.S.C. § 3565(a)) (emphasis added). Because the phrase was ambiguous, the Court applied the rule of lenity and interpreted the phrase to mean the applicable Guidelines sentence of imprisonment, not the revoked term of probation, resulting in a much shorter sentence. <u>Id.</u> at 1267-68. In that case, the defendant's conduct -- possessing illegal drugs while on probation -- was clearly illegal and the only question was the harshness of the penalty. The court's opinion thus implies that fair warning as to the harshness of criminal penalties is an important concern. <u>Accord</u> <u>Bifulco v. United States</u>, 447 U.S.

381, 400 (1980) (applying rule of lenity in deciding what punishment is authorized by a statute); Ladner v. United States, 358 U.S. 169, 178 (1958) ("This policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.").

Procedural protections at trial are inherently linked to such repercussions, for these protections affect the likelihood that a penalty will be imposed. At some point, differences in procedural protections become as significant as different penalties, and the need for fair warning just as critical. The degree of jury unanimity required by a statute is important enough a protection that we hesitate to interpret an ambiguous statute to require less, rather than more, unanimity.

Just as in the rule of lenity cases, we are faced with an ambiguous statute. See Smith v. United States, 113 S. Ct. 2050, 2059 (1993) (rule of lenity "is reserved for cases where, [a]fter seiz[ing] every thing from which aid can be derived, the Court is left with an ambiguous statute.") (quoting United States v. Bass, 404 U.S. 336, 347 (1971) (quoting United States v. Fisher, 6 U.S. (2 Cranch) 358, 386 (1805))) (internal quotations omitted). As mentioned, the language and legislative history of the CCE statute provide no clue as to Congress's view of specific unanimity. In such a situation, principles underlying the rule of lenity, in conjunction with the other principles we have

discussed, lead us to read the CCE statute to require unanimity as to each predicate offense.

## 2. Reconciling **United States v. Jackson**

The government argues that requiring specific unanimity as to predicate offenses would conflict with <u>United States v. Jackson</u>, 879 F.2d 85 (3d Cir. 1989), which held that, in a CCE prosecution, unanimous agreement is not required as to the identity of the five or more underlings supervised, organized, or managed by the defendant. <u>See also</u> <u>United States v. Canino</u>, 949 F.2d 928, 946 (7th Cir. 1992) (criticizing the apparent inconsistency between <u>Jackson</u> and <u>Echeverri</u>). However, a proper understanding of congressional intent shows that <u>Echeverri</u> and <u>Jackson</u> are quite consistent.

In <u>Jackson</u>, we considered whether, in a CCE prosecution, unanimous agreement is required as to the identity of the five or more underlings supervised, organized, or managed by the defendant. We concluded that the primary concern of the five or more persons requirement is "that the organization in which the defendant played a leadership role was sufficiently large to warrant . . . enhanced punishment," and held that unanimity on the specific identity of the underlings is not required. <u>Id.</u> at 88.

<u>Jackson</u>'s holding is consistent with our holding here for two reasons. First, unlike the continuing series requirement, the five-person requirement has a historical analogue in the law of conspiracy, which generally has not required the jury to

27

unanimously agree on the identity of the defendant's co-conspirators.  See United States v. Harris, 959 F.2d 246, 256 & n.13 (D.C. Cir.) (stating this proposition and citing cases), cert. denied, 506 U.S. 932, and cert. denied sub nom. Smith v. United States, 506 U.S. 932, and cert. denied sub nom. Palmer v. United States, 506 U.S. 933 (1992).[15]  Second, unlike the wide array of potential CCE predicate offenses, acting in concert with one group of five people is no more or less blameworthy than acting in concert with another group of five.  Id. at 256-57.  Thus, two of three reasons that lead us to conclude from its silence that Congress meant to require unanimity as to specific predicate offenses -- historical precedent and possible constitutional problems -- cause us to read congressional silence as to the five-person requirement quite differently.

### 3. Conclusion

In summary, we hold that the CCE statute requires unanimous agreement as to the identity of each of the three related offenses comprising the continuing series.  Our interpretation is guided by constitutional concerns, traditions in criminal jurisprudence, and the rule of lenity.  These background principles lead us to conclude that when a statute combines

---

[15] The CCE statute's requirement that the defendant act "in concert" with five or more other people, 21 U.S.C. § 848(c), is similar to conspiracy law's requirement that a defendant enter into an agreement with some number of co-conspirators.  Thus, the identity of a conspiracy defendant's co-conspirators provides a useful historical analogue to the identity of the five CCE underlings.

28

formerly distinct offenses into a single crime -- offenses that may occur at different times and in different places -- we should assume that Congress intended the formerly distinct offenses to retain their "offense" status with its attendant unanimity requirements.  Asking Congress to speak clearly is especially important here, where the penalty for violation of the statute is quite severe, from between twenty years to life in jail.  See 21 U.S.C. § 848(a).  Because there is no evidence of congressional intent to the contrary, we hold that the CCE statute requires unanimity as to its predicate offenses.

In making this decision, we do not hamper Congress's ability to enact innovative statutes to deal with new kinds of crime. Congress may alter unanimity requirements by statute if it makes its intention clear.[16]  Furthermore, as this case illustrates, see infra, unanimity as to predicate offenses is hardly an onerous burden.

### III. Harmless Error

Because there is a "reasonable likelihood," Estelle v. McGuire, 112 S. Ct. 475, 482 (1991); Boyde v. California, 494 U.S. 370, 380 (1990), that the jury interpreted the district court's general unanimity instruction to require agreement only that some three predicate violations occurred and not that the same violations occurred, the district court's failure to give Edmonds's proposed specific unanimity instruction was error. This

---

[16] As our holding is based on statutory interpretation, we do not reach the question whether the CCE statute would be unconstitutional absent a unanimity requirement.  We leave that decision for another day.

29

error implicates Edmonds's Sixth Amendment right to a unanimous verdict in a federal criminal trial.[17]  However, most

---

[17] Language in the Schad plurality opinion arguably casts some doubt on whether the Sixth Amendment is implicated in jury verdict specificity problems.  See Schad, 501 U.S. at 634 n.5 (plurality opinion) (criticizing the Fifth Circuit for grounding the right to jury consensus on a single course of action on the Sixth Amendment rather than the Due Process Clause).  However, read as a whole, we think that the Schad plurality's emphasis on the Due Process Clause does not mean that the Sixth Amendment is irrelevant here.  Rather, we conclude that the Sixth Amendment does require unanimity, in federal criminal trials, on all elements of the offense.  However, because what constitutes an "element" is purely a matter of legislative intent, the Sixth Amendment places no limit on the legislature's power to make alternative facts "means" not subject to a unanimity requirement. The limit on the legislature's definitional power, then, comes from the Due Process Clause.  See Miller, supra, at 2284.

We will not engage Judge Alito's alternative view that only the Sixth Amendment is relevant here.  As the Schad plurality pointed out, "this difference in characterization . . . is immaterial to the problem of how to go about deciding what level of verdict specificity is constitutionally necessary."  Schad, 501 U.S. at 634 n.5 (plurality opinion).

However, we reject the applicability of Judge Alito's constitutional test.  Judge Alito asserts that a legislative definition is unconstitutional only if it "contain[s] a combination of elements having no rational basis other than" an attempt to create room for factual disagreement underlying a conviction. While this framing of the issue represents an interesting way of balancing legislative deference with constitutional concerns, it is without support.  Judge Alito asserts that the problematic hypotheticals discussed in Schad —— (1) a crime permitting alternative findings of "embezzlement, reckless driving, murder, burglary, tax evasion, or littering," Schad, 501 U.S. at 633 (plurality opinion); and (2) "a felony consisting of either robbery or failure to file a tax return," id. at 650 (Scalia, J., concurring in the judgment) —— have no rational basis other than "the circumvention of otherwise applicable jury-unanimity requirements."  Although this may be a true descriptive claim, it does not justify displacing the constitutional tests explicitly stated by the Schad plurality (history, wide practice, and moral equivalence) and Justice Scalia (history) with a novel "rational combination of elements" test.

30

constitutional errors are subject to the harmless error analysis of <u>Chapman v. California</u>, 386 U.S. 18 (1967).  <u>See</u> <u>Rose v. Clark</u>, 478 U.S. 570, 578-79 (1986) ("[W]hile there are some errors to which <u>Chapman</u> does not apply, they are the exception and not the rule.").

Edmonds argues, and the original panel held, that <u>Sullivan v. Louisiana</u>, 113 S. Ct. 2078 (1993), precludes us from engaging in harmless error analysis.  In <u>Sullivan</u>, a unanimous Supreme Court held that a constitutionally deficient reasonable doubt instruction is not subject to harmless error analysis.  The Court reasoned that a verdict of guilty beyond a reasonable doubt is a necessary predicate of <u>Chapman</u>'s harmless error inquiry:

> [<u>Chapman's</u>] inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in <u>this</u> trial was surely unattributable to the error.  That must be so, because to hypothesize a guilty verdict that was never in fact rendered -- no matter how inescapable the findings to support that verdict might be -- would violate the jury-trial guarantee.
>
> . . . .  There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the <u>same</u> verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless.  There is no <u>object</u>, so to speak, upon which harmless error scrutiny can operate.  The most an appellate court can conclude is that a jury <u>would surely have found</u> petitioner guilty beyond a reasonable doubt -- not that the jury's actual finding of guilty beyond a reasonable doubt <u>would surely not have been different</u> absent the constitutional error.  That is not enough.  The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty.

113 S. Ct. at 2081-82 (citations omitted).[18] Edmonds asserts, and the panel agreed, that the jury instruction in this case allowed the jury to return a non-unanimous verdict on an element of the offense, and thus there is no actual jury finding of guilty upon which harmless error analysis may operate.

Edmonds and the panel are correct in a sense. Just as the Sixth Amendment precludes the court from affirming on the ground that the jury would have found the defendant guilty beyond a reasonable doubt had it been properly instructed, we cannot affirm a non-unanimous verdict simply because the evidence is so overwhelming that the jury surely would have been unanimous had it been properly instructed on unanimity.

Affirmance here, however, does not require making this speculative leap. Unlike the complete undermining of the verdict that occurred in Sullivan, this case involves error affecting only one of many findings made by the jury. The Supreme Court has held that similar errors -- jury instructions that erroneously contain a mandatory presumption or misdescribe an element of the offense -- may be harmless if the remaining unaffected jury findings are "functionally equivalent to finding" the lacking element. Carella v. California, 491 U.S. 263, 271

---

[18] In addition, the Court stated that "[a]nother mode of analysis leads to the same conclusion," and held that the unconstitutional reasonable doubt instruction was a "structural defect[] in the constitution of the trial mechanism" not subject to harmless error analysis. Id. at 2082-83 (quoting Arizona v. Fulminante, 49 U.S. 279 (1991) (opinion of Rehnquist, C.J., for the Court)) (internal quotations omitted); see also Sullivan, 112 S. Ct. at 2083-84 (Rehnquist, C.J., concurring) (applying the Fulminante analysis).

(1989) (Scalia, J., concurring in judgment)); see also Yates v. Evatt, 500 U.S. 391 (1991) (instruction containing an erroneous presumption); Carella v. California, 491 U.S. 263 (1989) (same); Rose v. Clark, 478 U.S. 570 (1986) (same); Pope v. Illinois, 481 U.S. 497 (1987) (instruction misstating an element of the offense).

Even though such errors impermissibly deprive the jury of its fact-finding function,[19] the resulting verdicts may be salvageable.  Specifically, if other facts found by the jury are "so closely related" to the fact tainted by erroneous instructions "that no rational jury could find those facts without also finding [the former] fact, making those findings is functionally equivalent to finding" the lacking element. Carella, 491 U.S. at 271 (Scalia, J., concurring in the judgment); see also Rose v. Clark, 478 U.S. 570, 580–81 (1986) ("When a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond a reasonable doubt.  In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not intend to cause injury.  In that event . . . [,] the jury has found, in Winship's words,

---

[19] See Carella, 491 U.S. at 265 ("Such directions subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned to juries in criminal cases."); id at 268 (Scalia, J., concurring in the judgment) ("The Court has disapproved the use of mandatory conclusive presumptions not merely because it conflict[s] with the overriding presumption of innocence . . ., but also because it invade[s] [the] fact-finding function which in a criminal case the law assigns solely to the jury.") (citations and internal quotations omitted) (alterations in original).

'every fact necessary' to establish every element of the offense beyond a reasonable doubt.") (citations omitted); Carella, 491 U.S. at 266 (quoting this passage from Rose with approval); Pope, 481 U.S. at 503 (same).

Sullivan itself distinguishes this line of cases from the fundamental flaw of misdescribing the burden of proof. In the latter case, the error "vitiates all the jury's findings." Sullivan, 113 S. Ct. at 2082 (emphasis in original). Absent "the essential connection to a 'beyond-a-reasonable-doubt' factual finding . . . a reviewing court can only engage in pure speculation." Id. at 2082 (citations omitted).

In this case it is unnecessary to speculate on what the jury's verdict would have been absent the erroneous instruction: the jury made proper unanimous findings of other facts which are "functionally equivalent" to finding that three specific predicate offenses were related to each other. Adhering to the assumption that jurors follow the instructions they are given, see Richardson v. Marsh, 481 U.S. 200, 211 (1987), we know that the jury unanimously found that Edmonds committed every CCE predicate offense alleged, and that Edmonds committed some three related predicate offenses.

The only finding for which unanimity is potentially lacking is that the same three predicate offenses are related to each other. However, the evidence introduced at trial to show that Edmonds committed each of the predicate offenses established that Edmonds used the same packers and mode of distribution throughout. See Edmonds, 52 F.3d at 1243. Edmonds did not argue

34

to the jury -- and has not argued since -- that any of the predicate offenses were unrelated to the others.[20] Thus, the facts necessarily found by the jury to convict on the predicate offenses show conclusively that all of the predicate offenses are related to each other.

In these circumstances, no rational jury could unanimously find Edmonds guilty of the predicate offenses without unanimously finding that the offenses were related to each other. See Ianniello v. United States, 10 F.3d 59, 64 (2d Cir. 1993) (holding that a failure to instruct the jury that a RICO conviction requires a relationship between predicate offenses was harmless because the evidence which the jury must have believed to convict on every alleged predicate act conclusively established their relatedness); United States v. Maloney, 71 F.3d 645, 658 (7th Cir. 1995) (holding harmless court's erroneously instructing the jury that it could convict for obstruction of justice under 18 U.S.C. § 1503 without finding that an official proceeding was pending because the jury's finding that the defendant attempted to obstruct justice "is so closely related to the ultimate and unrebutted fact of the existence of a pending grand jury proceeding"); United States v. Parmelee, 42 F.3d 387, 393 (7th Cir. 1994) (holding that a failure to instruct the jury

---

[20] Edmonds suggests in his answer to the government's petition for rehearing that it would have been improper to dispute relatedness in the absence of his requested specific unanimity instruction. We reject this argument because the jury was properly instructed that it must find three related offenses to convict under the CCE statute. Edmonds thus had ample incentive to contest relatedness.

on an essential element of 8 U.S.C. § 1324(a)(1)(B) was harmless because unrebutted evidence meant that no rational jury could have convicted without finding the missing element), cert. denied sub nom. Brozek-Lukaszuk v. United States, 116 S. Ct. 63, and cert. denied sub nom. Sobiecki v. United States, 116 S. Ct. 63 (1995).

Judge Stapleton takes issue with our understanding of the term "functionally equivalent" findings. While he does not say so explicitly, he seems to read Rose v. Clark to allow harmless error analysis only when untainted findings, considered without reference to the evidence supporting the findings, are logically equivalent to the missing element. Otherwise, he argues, the Court engages in impermissible speculation about what a properly instructed jury would have decided.

We acknowledge that the Supreme Court has not clearly defined "functionally equivalent" findings, and thus that there is some room for disagreement about the meaning of the term. Nevertheless, Judge Stapleton's position lies outside of the leeway left by the Supreme Court's pronouncements in this area. More importantly, his rule, if adopted, would frustrate the purpose of harmless error analysis -- to distinguish immaterial errors from those affecting the trial's truth-finding function.

Judge Stapleton argues that in Rose the missing element was "necessarily inferred" from fact findings in that case, while here we impermissibly establish the missing element from "the strength of the trial evidence." We disagree. Both the Rose Court and this Court allowed the missing element to be found by

36

looking at the jury's untainted findings _in light of the evidence supporting those findings_.  In _Rose_, the trial court impermissibly instructed the jury to presume malice from certain predicate facts:

> All homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption.  Thus, if the State has proven beyond a reasonable . . . doubt that a killing has occurred, then it is presumed that the killing was done maliciously.

_Rose_, 478 U.S. at 574.  Given this instruction, the jury need only have found that a killing had occurred to establish the element of malice.  But malice does not necessarily follow from the fact of a killing.  Therefore, the established predicate fact bore no logical relationship to the missing element.  In Judge Stapleton's terms, the fact that a killing has occurred is "as consistent" with the nonexistence of malice as it is with the existence of malice.

Nevertheless, the Supreme Court remanded for application of harmless error analysis.  The Court stated:

> When a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond a reasonable doubt.  In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not _intend_ to cause injury.

_Id._ at 580-81.  The Court was explicit that this inquiry would consider the evidence introduced at trial.  In particular, it noted that "[t]he parties disagree on the scope of the evidence that must be assessed" on remand.  _Id._ at 584. n.13; _see_ _also_ _id._ at 583 (making several references to _Chapman_'s requirement that

37

the entire record be reviewed).[21]  In giving directions for
remand, the Court gave the following example:

> [I]t would defy common sense to conclude that an
> execution-style killing or a violent torture-murder was
> committed unintentionally.  It follows that no rational
> jury would need to rely on an erroneous presumption
> instruction to find malice in such cases.

Id. at 581 n.10.  Presumably, in the example described by the
Court, the jury would not make findings as to the existence of
"an execution-style killing or a violent torture-murder." Rather,
such facts could only be shown by the evidence supporting the
jury's finding that a homicide had occurred.

Our reading of the functional equivalence test -- which
allows inquiry into evidence necessary to support the jury's
findings -- is faithful both to the erroneous presumption cases
and to Sullivan.  Following the erroneous presumption cases, we
examine the evidence in the record.  However, our analysis
follows Sullivan's admonition not to speculate on what the jury
would have found had it been correctly instructed.  By examining
the evidence necessary to support the jury's findings, we are not
weighing any evidence, as Judge Stapleton suggests, but simply
using undisputed evidence to give content to the jury's untainted
findings.

---

[21] Although Justice Scalia's concurrence in Carella criticized a
broad review of the record in erroneous presumption cases, he has
not suggested that it is improper to examine the jury's findings
in light of evidence in the record necessary to establish those
findings.  Furthermore, Justice Scalia's view of the impact of
record evidence has not carried a majority of the Court.  Rather,
the Court has stated that harmless error analysis in erroneous
presumption cases includes a review of the record.  See Yates,
500 U.S. at 405-06; Rose, 478 U.S. at 583-84.

38

Furthermore, our analysis furthers the purpose of harmless error analysis:

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

Rose, 478 U.S. at 577 (citations omitted). In this case, the jury was instructed that, to convict, it had to find three related predicate offenses and that it had to unanimously find that every predicate offense occurred. All of the evidence establishing the predicate offenses showed that they were related. Importantly, Edmonds never even suggested that the offenses were unrelated, and nothing in the trial record suggests such a conclusion. In such a case, it requires no speculation to see that the error did not affect the verdict.[22]

Accordingly, we hold that the error was harmless beyond a reasonable doubt, Chapman, 386 U.S. at 24. The judgment of the district court will therefore be affirmed.

---

UNITED STATES v. THEODORE EDMONDS, No. 93-1890

STAPLETON, J., Concurring in Part and Dissenting in Part:

I join in parts I and II of the court's opinion. I am unable to join part III.

---

[22] While Judge Greenberg joins in Judge Garth's opinion that the charge was correct, if he concluded that the charge was erroneous he would join in Part III of this opinion with respect to harmless error.

The court finds that the district court's refusal to require unanimity was harmless error. This is justified, it maintains, because the evidence concerning the nine narcotics violations which the jury found to have occurred could lead a rational jury to no conclusion other than that all were related. While this view has undeniable surface appeal, it is irreconcilably at odds with the teaching of Sullivan v. Louisiana, 508 U.S. 275 (1993). Because of Sullivan, I would reverse and remand for a new trial on the CCE count.

A judge cannot, consistent with the Sixth Amendment right to a jury trial, direct a verdict for the prosecution no matter how overwhelming the evidence of guilt may be. This Sixth Amendment right "includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.'" Id. at 277. Moreover, the due process clause requires that this finding of guilt be a finding beyond a reasonable doubt. As the Court held in Sullivan, this means that the jury must find each of the essential elements of crime charged beyond a reasonable doubt. If the court's instructions to the jury communicate a standard for the government's burden of proof less than the beyond a reasonable doubt one, there can be "no jury verdict of guilty-beyond-a-reasonable doubt." If there is no such verdict, "[t]here is no object, so to speak, upon which harmless-error scrutiny can operate," id. at 280, and the defect cannot be cured by a judge's finding that "in a trial . . . without the error, a guilty verdict would surely have been rendered." Id. at 279. As my

40

colleagues purport to recognize, "to hypothesize a guilty verdict that was never in fact rendered -- no matter how inescapable the findings to support that verdict might be -- would violate the jury-trial guarantee." Id.

The Sixth Amendment right to a jury trial includes the right to a unanimous jury agreement on each element of the offense charged, as well as an agreement on each such element beyond a reasonable doubt. United States v. Beros, 833 F.2d 455 (3d Cir. 1987). When this fundamental principle is added to the holding in Sullivan, it follows that the constitutionally required jury verdict is missing when the jury is not instructed that its verdict on each element of the offense must be unanimous. In such a case, "[t]here is no object, so to speak, upon which harmless error scrutiny can operate. The most an appellate court can conclude is that a [unanimous] jury would surely have found petitioner guilty beyond a reasonable doubt -- not that the jury's actual [unanimous] finding beyond a reasonable doubt would surely not have been different absent the constitutional error." Sullivan at 280.

This appellate court has determined today only that, given the evidence at trial, a jury properly charged would surely have unanimously agreed beyond a reasonable doubt that all of Edmonds' narcotics violations were related to one another. Under Sullivan, this is not a sufficient basis for affirming his CCE conviction.

The court distinguishes Sullivan on the ground that Edmonds' case is more like a line of mandatory presumption cases which the

41

Supreme Court distinguished in Sullivan.  Id. at 280-81.  In cases like Rose v. Clark, 478 U.S. 570 (1986) and Carella v. California, 491 U.S. 263 (1989), the Court indicated that harmless error analysis is permissible in some cases where the jury has been instructed to apply mandatory presumptions that unconstitutionally relieved the state of its burden of proving all elements of the offense beyond a reasonable doubt.  As the Court explained in Sullivan, the Sixth Amendment right to a jury trial is not violated by a harmless error analysis in a mandatory presumption case if the predicate facts that the jury had to find before the presumption was triggered were "so closely related to the ultimate fact to be presumed that no rational jury could find those [predicate] facts without also finding that ultimate fact, making those findings [the] functional equivalent [of] the element required to be presumed."  Sullivan at 281 (quoting from Carella, 491 U.S. at 271).

This case is not like Rose and Carella, however, and is indistinguishable from Sullivan.  In Rose and Carella, the court could point to an actual finding made by the jury that was the functional equivalent of the element that the jury was required to find in order to support a guilty verdict.  In this case, the court has not, and cannot, point to such a jury finding.

In Rose, for example, the jury was instructed in such a manner that the court knew the jury had found either the malice required for a murder conviction or predicate acts on the part of the defendant from which malice was necessarily inferred.  As the Court in Rose noted, "[w]hen a jury is instructed to presume

42

malice from predicate facts, it must still find the existence of those facts beyond a reasonable doubt," 478 U.S. at 580, and when that finding is the functional equivalent of the element required, there is an "object, so to speak, upon which harmless error scrutiny can operate." Sullivan at 280. In none of the mandatory presumption cases where the Supreme Court has approved harmless error analysis has the Court relied solely on the strength of the trial evidence.

In Edmonds' case, the only unanimous jury finding to which this court can point is a finding that Edmonds committed nine narcotics felonies. That finding is not the functional equivalent of a finding that those felonies were related. It is as consistent with those felonies being unrelated as it is with their being related. My colleagues have not concluded that relatedness necessarily follows from a fact the jury found; they have, rather, concluded that relatedness necessarily follows from the evidence tendered by the government at trial.[23] Their

---

[23] This critical distinction was emphasized by Justice Scalia, writing for four justices, in Carella:

> [T]he harmless error analysis applicable in assessing a mandatory conclusive presumption in wholly unlike the typical form of such analysis. In the usual case the harmlessness determination requires consideration of "the trial record as a whole" in order to decide whether the fact supported by improperly admitted evidence was in any event overwhelmingly established by other evidence.

491 U.S. at 267 (Scalia, J., concurring) (citations omitted). In contrast, Justice Scalia explained, the type of harmless error analysis applied in mandatory presumption cases seeks to determine whether there are jury findings beyond a reasonable doubt that are "functionally equivalent" to the missing element. The Court adopted Justice Scalia's analysis in Sullivan, and to

43

conclusion does not alter the critical fact under <u>Sullivan</u> --
there is no unanimous jury verdict "upon which harmless-error
scrutiny can operate."  <u>Id.</u>  <u>United States v. Edmonds</u>, No. 93-
1890

ALITO, <u>Circuit Judge</u>, concurring in part and dissenting in part.


    I agree with the court that the defendant's conviction
should be affirmed, but I cannot accept the conclusion that the
trial judge erred in refusing to instruct the members of the jury
that they were required to agree unanimously with respect to the
particular offenses that made up the "continuing series" of
violations that were necessary for the defendant's conviction
under the Continuing Criminal Enterprise ("CCE") statute, 21
U.S.C. § 848.  Unlike the majority, I am convinced that Congress
had no intention of imposing such a requirement when it enacted
the CCE statute.  I also conclude that such an instruction is not
constitutionally required.

    For these reasons, I concur in the judgment, but I join only
part III of the court's opinion, which discusses harmless error.
I approve this part of the court's opinion because, assuming for
the sake of argument that the trial judge erred, I agree with the
court that the error was harmless.  I also join Judge Garth's
opinion, but I write separately to explain in somewhat different

_____

the extent this distinction is inconsistent with the terms of the
remand in <u>Rose</u>, <u>Sullivan</u>, not <u>Rose</u>, is currently the law of the
land.


44

terms why I disagree with the court's analysis of the jury-unanimity issue.

## I.

I will first address the majority's statutory interpretation argument, i.e., its argument that Congress meant to include as part of the CCE statute a special jury-unanimity requirement that is independent of that contained in Fed. R. Cr. P. 31(a) (which simply requires a unanimous "verdict") and of constitutional requirements (which I discuss in Part II of this opinion). I think that the majority's interpretation of the CCE statute is wrong because it has no support in the language or legislative history of the CCE statute and because Congress has not followed the practice of including special jury-unanimity requirements as a part of criminal statutes (other than a few recent statutes setting out capital sentencing procedures.)[24]

A. The pertinent part of the CCE statute, 21 U.S.C. §848(c), provides as follows:

> For purposes of subsection (a) of this section [which sets out penalties], a person is engaged in a continuing criminal enterprise if --
>
> (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
>
> (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter --

---

[24] See 18 U.S.C. § 3593; 21 U.S.C. § 848(k). I discuss 21 U.S.C. § 848(k) in footnote 2, infra.

45

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position or organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

There is nothing in this language or any other portion of the CCE statute that even hints that Congress intended to require jury unanimity with respect to the particular offenses needed to satisfy 21 U.S.C. §848(c)(2) -- and the majority does not contend otherwise. See Maj. Op at 10. Indeed, the majority does not identify any statutory language that could serve as a reference point for its interpretation. Thus, even if there were extra-textual support for the proposition that Congress intended to impose a special jury-unanimity requirement in CCE cases, the majority's interpretation would run into difficulty, for as the Supreme Court has noted, "`courts have no authority to enforce [a] principl[e] gleaned solely from the legislative history that has no statutory reference point.'" Shannon v. United States, 114 S.Ct. 2419, 2426 (1994) (citation omitted); accord United States v. Fisher, 10 F.3d 115, 120 (3rd Cir. 1993).[25]

---

[25]It is worth noting that another portion of the CCE statute, 21 U.S.C. §848(k), expressly requires jury unanimity with respect to a different finding. In 1988, death penalty provisions were added to the CCE statute. See Anti-Drug Abuse Act of 1988, Pub. L. 100 - 690, § 7001, 100 Stat. 4387. Under one of these new provisions, 21 U.S.C. §848(k), a death sentence may be imposed only if aggravating factors are found to exist, and this provision expressly provides that "[a] finding with respect to any aggravating factor must be unanimous." While this provision was enacted well after the portion of the statute, 21 U.S.C §848(c), with which we are now concerned, the presence of an express jury-unanimity requirement in another subsection of the

2

B.  Finding no support for a special jury-unanimity requirement in the language of §848(c), I turn to the legislative history of that provision, and again I find no support.  As the majority states, neither the parties nor the majority itself has unearthed any indication in the legislative history that Congress intended to adopt such a special requirement.  See Maj. Op. at 17.  Thus, the two sources on which we most frequently rely in interpreting statutes, the statutory language and the legislative history, provide no basis for holding that §848(c) contains a special jury-unanimity requirement -- or even for concluding that there is any ambiguity on this point.

C.  If this is not enough to refute the majority's interpretation, any remaining doubt must vanish when it is noted that Congress has not customarily included special jury-unanimity requirements in federal criminal statutes (other than the few I mentioned earlier that concern capital sentencing procedures).  Indeed, I have not found any federal criminal statutes outside the field of capital sentencing that contain special unanimity requirements.  If I have overlooked any, I hope that my colleagues in the majority will call them to my attention.  But if I am right that Congress, as a uniform or general practice, has not adopted such special unanimity requirements, that

_____

CCE statute weighs against the proposition that Congress, in enacting §848(c), intended to impose an analogous requirement but either felt that it was unnecessary or neglected to insert any statutory language manifesting such an intent.  The express jury unanimity requirement in 21 U.S.C. § 848(k) "shows that Congress knew how to draft [such a requirement] when it wanted to."  City of Chicago v. Environmental Defense Fund, 114 S. Ct. 1588, 1593 (1994).

3

practice seems to me to be telling.  With no congressional custom of adopting such special unanimity requirements and no hint in the statutory language or legislative history that Congress meant to break new ground and impose such a requirement under §848(c), I think that the majority's interpretation can confidently be rejected.

D.  The majority claims that its interpretation of §848(c) is supported by two canons of construction -- the rule of lenity and the rule that an ambiguous statute should be interpreted where possible to avoid "`grave and doubtful constitutional questions.'"  Maj. Op. 21 (quoting United States ex rel. Attorney General v. Delaware & Hudson Co., 213 U.S. 366 (1909)).  Neither of these canons, however, is applicable here.  Both canons may properly be invoked only when the statute in question is legitimately ambiguous on the point at issue.  These canons are, after all, tools for identifying, not overriding, congressional intent.  As the Supreme Court recently noted, the rule of lenity "applies only if, `after seizing everything from which aid can be derived,' we can make `no more than a guess as to what Congress intended.'"  Reno v. Koray, 115 S.Ct. 2021, 2029 (1995) (citation omitted); See also United States v. Turcks, 41 F.3d 893, 901 (3d Cir. 1994) (rule of lenity "operates only after it is determined that a criminal statute is ambiguous, not at the beginning of the process of construction, as an overriding consideration of being lenient to wrongdoers") (citation and internal quotations omitted); United States v. Lanier, 73 F.3d 1380, 1390 (6th Cir. 1996) (when applying the rule of lenity courts should not go to

4

extreme lengths to characterize criminal statutes as ambiguous when they can be read as relatively well-defined); <u>United States v. Valencia-Andrade</u>, 72 F.3d 770, 774 (9th Cir. 1996) (rule of lenity serves as aid for resolving ambiguity; it is not used to beget one).  Likewise, "resort to an alternative construction to avoid deciding a constitutional question is appropriate only when such a course is `fairly possible' or when the statue provides a `fair alternative' construction." <u>Swain v. Pressley</u>, 430 U.S. 372, 378 n.11 (1977); <u>See</u> <u>also</u> <u>Friedrich v. United States</u>, 974 F.2d 409, 418-19 (3d Cir. 1992) ("Although a statute should be interpreted in a fashion that does not defeat the congressional purpose, . . . a court may not rewrite an unambiguous law") (citation omitted); <u>United States v. Salisbury</u>, 983 F.2d 1369, 1380 (6th Cir. 1993) (same); <u>Block v. Meese</u>, 793 F.2d 1303, 1310 (D.C. Cir. 1986) (Scalia, J.) (court may not read limitation into statute to avoid constitutional issue where no language in statute supports such interpretation).  In this case, therefore, in the absence of any ambiguity as to whether Congress intended to include a special jury-unanimity requirement in §848(c) -- and for the reasons explained above, I see no such ambiguity -- neither of the canons advances the majority's argument.

E.  The only remaining source of authority invoked by the majority -- and thus the sole pillar on which its entire statutory construction argument rests -- is its understanding of "general historical tradition in criminal jurisprudence."  Maj. Op. at 19.  The majority states:

> Criminal trials have long ensured substantial jury agreement as to the facts establishing the offense.  <u>This is because criminal statutes and the common law have generally defined crimes in terms of conduct (and accompanying mental state) that takes place in a single place at some specific time</u>.  For example, murder statutes require that the defendant killed some other person, <u>an act occurring in some specified time and place</u>.  Thus, when a jury delivers a general guilty verdict for such a crime, <u>we are confident that the jury agreed on most of the actions engaged in by the defendant</u>.

<u>Id.</u> (emphasis added).

The majority cites no authority for this reading of "general historical tradition in criminal jurisprudence," and I believe that the majority has overstated the principle that can legitimately be drawn from established criminal law precedents.  To be sure, our law has traditionally demanded <u>a degree of specificity</u> in criminal prosecutions.  Many rules of law, including those governing charging instruments[26] and bills of particulars,[27] work toward this end.  But it is simply not true that the jury is always required to "agree[] on most of the actions engaged in by the defendant."  Maj. Op. at 19.  Nor is it true that the prosecution has invariably[28] been required to

---

[26]<u>See</u>, <u>e.g.</u>, Fed. R. Crim. P. 3 (a complaint sets out "the essential facts constituting the offense charged"); Fed. R. Crim. P. 7(c)(1) (the indictment or the information must set out "the essential facts constituting the offense charged.").

[27]<u>See</u> Fed. R. Crim. P. 7(f).

[28]I am aware that the majority states that "criminal statutes and the common law have <u>generally</u> defined crimes in terms of conduct (and accompanying mental state) that takes place in a single place at some specified time."  Maj. Op. at 19 (emphasis added).  If this rule is only "generally" true, however, then there must be instances in which it is not true.  And if that is so, then I think it is incumbent upon the majority to explain when the rule does not apply and why the present case is not analogous to those in which this rule has not traditionally held true.  The majority provides no such explanation.

6

establish the "specified time and place" where a charged offense occurred.  Id.

In invoking "general historical tradition in criminal jurisprudence," the majority relies on the law of murder, but I believe that this body of law exposes the weakness of the majority's analysis.  It is not correct, for example, that in a murder case the jury is required to "agree[] on most of the actions engaged in by the defendant."  Maj. Op. at 19.  Both the holding and the controlling opinions in Schad v. Arizona, 501 U.S. 624 (1991), illustrate this point.

Under the holding of Schad, which followed traditional practice (see id. at 640-42 (opinion of Souter, J.); id. at 648-50 (opinion of Scalia, J.)), a defendant may be convicted of first-degree murder even if some of the jurors base their guilty votes on the theory of felony-murder and others do not.  Suppose, therefore, that the evidence in a murder case shows that the victim was driving in a remote area when he picked up the defendant, who was hitchhiking.  Suppose that the victim's body is later found at the bottom of a cliff, that the medical examiner attributes death to a fall, that the defendant is later stopped while driving the victim's car and is found to have made many purchases using the victim's credit cards, and that forensic evidence ties the defendant to the victim's death.  Suppose that six jurors conclude that the defendant deliberately pushed the victim off the cliff but that the remaining six jurors think that the victim accidentally fell to his death while attempting to flee from the defendant, who was robbing him.  Schad teaches that

7

the jury could find the defendant guilty of first-degree murder despite this important disagreement about the defendant's conduct.

Moreover, even if the jurors in a murder case all agree that the defendant intentionally killed the victim, both Justice Souter's and Justice Scalia's opinions in Schad make clear that the jurors need not agree on how the killing was accomplished. Justice Souter discussed Andersen v. United States, 170 U.S. 481 (1898), in which the Court upheld a murder conviction despite the fact that the indictment did not specify whether the death was caused by shooting or drowning. See 501 U.S. at 631. He then observed:

> We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission. . . . In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. . . ."

501 U.S. at 631-32 (citation omitted). Justice Scalia made the same point by means of a hypothetical. He wrote:

> When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her.

501 U.S. at 650 (Scalia, J., concurring). Thus, it seems clear to me that the majority is wrong in saying that under traditional practice the jury in a murder case must always "agree[] on most of the actions engaged in by the defendant." Maj. Op. 19.

8

Nor is the prosecution in a murder case always required to nail down the "specified time" or "specified . . . place" of the killing. To take another hypothetical case, suppose that a motorist is seen picking up a hitchhiker at one end of a state and that the hitchhiker is stopped many days later at the other end of the state driving the motorist's car. Suppose also that blood stains are found in the trunk, that the motorist's bullet-ridden body is discovered in a wooded area in another part of the state and that other evidence tying the hitchhiker to the crime is gathered. Would anybody suggest that the hitchhiker cannot be convicted unless the prosecution can prove specifically where and when the killing occurred?

In short, I do not think that it is possible to distill from "general historical tradition in criminal jurisprudence" the principle that the jury must always "agree[] on most of the actions engaged in by the defendant" or the principle that the prosecution must always prove that a charged offense occurred at a specific place or time. Instead, I think that our law has traditionally allowed some flexibility with respect to these matters, and thus I do not discern any traditional practice that provides appreciable support for the majority's interpretation of §848(c). Certainly I do not see anything that can begin to overcome the lack of support for that interpretation in either the statutory language or the legislative history and the absence of any congressional practice of imposing special jury-unanimity requirements as part of criminal statutes (other than the few I mentioned concerning capital sentencing). I therefore conclude

9

that §848(c) does not include any special jury-unanimity requirement.

                                        II.

A.  Because I reject the majority's statutory interpretation argument, I now turn to the question whether the Constitution obligated the trial judge in this case to instruct the members of the jury that they were required to reach unanimous agreement as to the particular offenses that made up the "continuing series" of violations that the defendant committed.  Because this is a federal case, the only  constitutional provision relevant to the issue of jury-unanimity, in my view, is the Sixth Amendment.  Unlike the majority, I do not think that the Due Process Clause of the Fifth Amendment has any bearing on this issue.[29]  See Maj. Op. 21.

_____

[29]My evaluation of the constitutional issue presented in this case would not change if I believed that the Due Process Clause of the Fifth Amendment were applicable here, but I do not think that it is.

The Sixth Amendment expressly guarantees the right to "trial by jury" and has been held to require a unanimous verdict in a federal criminal prosecution.  See 12-13, infra.  The Due Process Clause of the Fifth Amendment, of course, provides general protection for "liberty."  "Where a particular amendment `provides an explicit textual source of constitutional protection' against a particular sort of government behavior, `that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" Albright v. Oliver, 114 S. Ct. 807, 813 (1994)(plurality)(quoting Graham v. Connor, 490 U.S. 386, 395 (1989).  See also id. at 814 (Scalia, J., concurring); cf. id. at 817 (Ginsburg, J., concurring); id. (Kennedy, J., concurring); id. at 819-22 (Souter, J., concurring).  Furthermore, the proposition that the Due Process Clause of the Fifth Amendment guarantees jury unanimity to a greater degree than does the Sixth Amendment seems

B.  The Sixth Amendment guarantees the right to a "trial by jury" in "all criminal prosecutions" in federal court.  In Johnson v. Louisiana, 406 U.S. 356 (1972), and Apodaca v. Oregon, 406 U.S. 404 (1973), five Justices concluded that this right includes the right to a unanimous verdict.  Justice Powell, who cast the deciding vote, reasoned as follows:

> [I]n amending the Constitution to guarantee the right to jury trial, the framers desired to preserve the jury safeguard as it was known to them at common law.  At the time the Bill of Rights was adopted, unanimity had long been established as one of the attributes of a jury conviction at common law.  It therefore seems to me, in accord both with history and precedent, that the Sixth Amendment requires a unanimous jury verdict to convict in a federal criminal trial.

Johnson v. Louisiana, 406 U.S. at 371 (Opinion of Powell, J.) (emphasis added) (footnote omitted).

As the highlighted portion of Justice Powell's opinion states, the common law and American practice at the time of the

---

to be inconsistent with the Supreme Court decisions holding that the Due Process Clause of the Fourteenth Amendment requires less jury unanimity than does the Sixth Amendment.  See Johnson v. Louisiana, 406 U.S. 356 (1972); Apodaca v. Oregon, 406 U.S. 464 (1972).

In Schad v. Arizona, 501 U.S. 624 (1991), both the plurality opinion (see id. at 632–645) and Justice Scalia's concurrence (see id. at 649–652) discussed the constitutional restrictions imposed by the Due Process Clause of the Fourteenth Amendment because Schad was a state prosecution and the Sixth Amendment's implicit guarantee of a unanimous jury verdict is not applicable to the states.  Johnson v. Louisiana, supra; Apodaca v. Oregon, supra. (This is my interpretation of the main thrust of footnote 5 of the Schad plurality opinion (501 U.S. at 634 n.5), which the majority discusses.  See Maj. Op. 30 n.16.)

Some of the hypothetical statutes mentioned in the Schad plurality opinion and in Justice Scalia's concurrence could raise due process concerns unrelated to the question of jury unanimity. But insofar as jury unanimity is concerned, I see no justification for looking further than the Sixth Amendment.

11

adoption of the Bill of Rights required a unanimous jury _verdict_ -- and, as far as I am aware, nothing more.[30]  And subject to the proviso discussed in part II C of this opinion, I do not think that the Sixth Amendment goes any further.  Thus, in my view, the Sixth Amendment requires that jurors be instructed regarding the elements of the offense with which the defendant is charged, and each juror, before deciding to vote "guilty," must decide in his or her own mind that every element was proven beyond a reasonable doubt.  When the jurors vote, they must unanimously vote "guilty" in order for there to be a conviction.  But assuming that they all vote "guilty," the Sixth Amendment unanimity requirement does not demand anything more.  It does not require unanimity with respect to any subsidiary factual determinations that the individual jurors may have made in their own minds before casting their votes.

Under this approach, it is apparent that the breadth of the legislative definition of an offense substantially affects the degree of unanimity that is required.  The more narrowly an offense is defined, the less room there will be for jurors to disagree on subsidiary factual matters.  And the more broadly an offense is defined, the more room there will be for such

---

[30]_See_, _e.g._, 4 W. Blackstone, _Commentaries_ *376; Virginia Declaration of Rights, sec. 8 (protecting right "to a speedy trial by an impartial jury of [the] vicinage, without whose unanimous consent [a defendant] cannot be found guilty"); Delaware Declaration of Rights and Fundamental Rules, § 14 (protecting "right to a speedy Trial by an impartial Jury, without whose unanimous Consent [a defendant] ought not to be found Guilty"); Vt. Constitution of 1777 ch. 1, art. X (defendant cannot be found guilty without "the unanimous consent" of the "jury").

disagreement. Suppose that State A defines first-degree murder as knowingly or purposely causing the death of another person. Suppose that State B defines first-degree murder as knowingly or purposely causing the death of another human being or causing the death of another human during the commission of a felony. The degree of unanimity required in State A is greater than in State B because in the latter a defendant could be convicted of first-degree murder even if some jurors think that he caused the death knowingly or purposely and others think he merely caused the death during the commission of a felony. But as Schad instructs, the scheme adopted by State B does not offend the Constitution.

C.  I now come to the proviso to which I previously referred. Because of the relationship noted above between the breadth of the legislative definition of an offense and the degree of jury-unanimity needed to produce a unanimous verdict, Congress could circumvent the Sixth Amendment's guarantee of a unanimous verdict by lumping together incongruous elements under the rubric of a single offense. I do not think that the Sixth Amendment would tolerate such a stratagem. If a new offense contained a combination of elements having no rational basis other than the evasion of the Sixth Amendment's jury unanimity requirement, that combination would be unconstitutional.

In Schad, both Justice Souter's and Justice Scalia's opinions pointed out that there could be extreme circumstances in which the Constitution would require jury-unanimity with respect to something other than the jury's general verdict of guilty. Justice Souter's opinion recognized that the meaning of the right

13

to a unanimous verdict in a particular case depends on the legislative definition of the offense with which the defendant is charged, and he noted that this right could be undermined if a legislative body simply lumped together incongruous elements under the rubric of a single offense.  501 U.S. at 630-33. Concluding that the Constitution would not permit such a ploy, he observed that "nothing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of `Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction."  Id. at 633 (footnote omitted).

Justice Souter stressed, however, that considerable deference should be given to a legislative judgment concerning the definition of a criminal offense -- or, in other words, to a legislative judgment that a particular combination of elements should be regarded as constituting a single rather than multiple offenses.  See id. at 637-40.  He spoke of "a threshold presumption of legislative competence,"  the importance of "judicial restraint," and the need to avoid "judicial second-guessing."  Id. at 637-38.  Emphasizing that a legislature's "`definition of the elements of [an] offense is usually dispositive,'" he nevertheless made clear that  "`there are obviously constitutional limits beyond which [a legislative body] may not go."  Id. at 639 (citation omitted).  In deciding whether these limits have been violated, he concluded, both "history and widely shared practices" are instructive.  Id. at 640.  He also

observed that, when a statute sets out alternative elements, it is appropriate to consider whether they can reasonably be viewed as reflecting "notions of equivalent blameworthiness or culpability" or whether, as in his previous example of the offense of "Crime," no such view of the definition can reasonably be entertained. Id. at 643.

Justice Scalia's concurrence set out a similar but not identical analysis. He noted that "one can conceive of novel `umbrella' crimes (a felony consisting of either robbery or failure to file a tax return) where permitting a 6-to-6 verdict would seem contrary to due process." Id. at 650 (Scalia, J. concurring). In a somewhat similar vein, he later added that "[w]e would not permit . . . an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday." Id. at 651. Applying his view that the Due Process Clause of the Fourteenth Amendment does not proscribe deeply rooted historical practices, he concluded that Arizona's definition of murder, which represented the historical norm, did not violate due process. Id. at 651. Since Schad grew out of a state prosecution, both these opinions discussed the requirements of the Due Process Clause of the Fourteenth Amendment, rather than the Sixth Amendment, but I believe that it is appropriate to translate their discussion into Sixth Amendment terms.

Under either Justice Souter's or Justice Scalia's analysis, Congress's definition of a "continuing criminal enterprise" does not, in my opinion, exceed the broad limits allowed for legislative judgment in determining whether particular elements

should be combined to form a single offense. I readily acknowledge that the CCE statute, unlike the Arizona murder statute at issue in Schad, is not based on a long and widely accepted model but instead, as I discuss below, represents a innovative approach developed by Congress some 25 years ago. In light of these origins, the CCE statute cannot claim the protection from constitutional challenge that a more traditional criminal statute might enjoy, but this does not mean that the CCE statute is automatically suspect. As patterns of crime change, legislative bodies must have the freedom, within constitutional limits, to devise new ways of responding to those changes, including the creation of new crimes that are not closely modelled on any common law antecedents.

Although the CCE statute does not enjoy the protection of ancient lineage, I believe that both its structure and background support its constitutionality and comfortably distinguish it from the examples of impermissible statutes that were cited in the Schad plurality and concurring opinions. Justice Souter's example -- an offense called "Crime" that would require proof that the defendant committed at least one act of "embezzlement, reckless driving, murder, burglary, tax evasion, or littering" (501 U.S. at 633 (opinion of Souter, J.)) -- seems to represent a combination of elements having no rational basis other than the circumvention of otherwise applicable jury-unanimity requirements. No element other than proof of one of the predicate offense appears to be necessary for conviction, and the predicate offenses are widely dissimilar. It is hard to imagine

16

what legitimate basis there could be for such a combination of elements.

The hypothetical laws discussed by Justice Scalia seem to me to have similar flaws. What legitimate basis could there be for creating a crime "consisting of either robbery or failure to file a tax return" or permitting a defendant to be prosecuted for the offense of assaulting "either X on Tuesday or Y on Wednesday"? See 501 U.S. at 651 (Scalia, J., concurring).

The CCE statute differs sharply from these monstrosities. For one thing, there are important structural differences. The CCE statute sets out several elements in addition to the commission of the predicate offenses that must be proven in every case. Specifically, it must be shown, not only that the defendant committed a "continuing series of violations," but that (a) he undertook this activity "in concert with five or more other persons," (b) that "with respect to [these persons] he occupie[d] a position of organizer, a supervisory position, or any other position of management," and (c) that he "obtain[ed] substantial income or resources" from this series of violations. 21 U.S.C. §848(c). The presence of these additional elements supports the view that the CCE statute represents an effort to define a distinct type of criminal activity.

The background of the CCE statute fortifies this view. The CCE statute was enacted as part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. 91–513, 84 Stat. 1236. After study and consideration, Congress concluded that drug abuse was "approaching epidemic proportions," that existing

17

federal drug laws were inadequate, and that new approaches were needed. H.R. Rep. 91-1444, 91st Cong., 2d Sess., at 6, reprinted in 1970 U.S. Cong. & Admin. News 4566, 4571-72. The CCE statute represented one such innovative approach. Drafted to address what Congress considered a rapidly growing problem, this statute departed significantly from common law models and prior drug laws. Much like the RICO statute, see 18 U.S.C. §§ 1961-64, which was passed at roughly the same time, the CCE statute created a new crime by reference to a criminal organization or "enterprise." In enacting both of these ground-breaking statutes, it was apparently Congress's judgment that a new organizational approach was necessary in order to mount an effective attack on criminal groups that were causing great societal damage.

To my mind, this background must be taken into account in considering whether Congress exceeded constitutional bounds by creating the offense set out in 21 U.S.C §848(c). This background shows, I believe, that Congress had a rational and legitimate basis for crafting the particular combination of elements required under 21 U.S.C §848(c)(2). Specifically, this background demonstrates that it was the judgment of Congress that a new type of criminal activity was growing in importance and that a new type of criminal statute, keyed to the organizational scope of that activity, was needed. This legislative judgment, in my view, is entitled to substantial respect. See Schad, 501 U.S. at 637-39 (opinion of Souter, J.).

18

Based on the structure and background of the CCE statute, I am persuaded that the statute does not contravene the Sixth Amendment's jury unanimity requirement but instead constitutes a permissible of exercise of Congress's broad power to define the scope of federal criminal offenses.

### III.

For these reasons, I do not think that the trial judge in this case erred in refusing to instruct the members of the jury that they were required to agree unanimously on the predicate offenses committed by the defendant.  If the trial judge had erred, however, I think that the error would be harmless for the reasons explained in part III of the opinion of the court.

<u>United States v. Theodore Edmonds</u>
No. 93-1890

(Argued In Banc October 25, 1995)

_____

GARTH, Circuit Judge, <u>Concurring in Part and Dissenting in Part</u>, SLOVITER, Chief Judge, GREENBERG, NYGAARD, ALITO and ROTH, Circuit Judges, Join in this Concurring and Dissenting Opinion.

While I agree that Edmonds' conviction must be sustained, I cannot agree that any error was committed by the district court.  Because there was no error, it is a needless exercise to address whether that error was harmless.

Congress has never required a unanimous finding for each and every component of the Continuing Criminal Enterprise ("CCE") statute, 21 U.S.C. § 848(c). Therefore, in my opinion, the jury was not required to unanimously agree on which three predicate acts constituted the "continuing series of violations" for purposes of the CCE statute, as Echeverri required, and which the majority of the Court now reaffirms.

## I.

In this case, we have been asked to decide whether the identities of the predicate acts constituting the "continuing series of violations" prong of the CCE statute are so essential to proof of the CCE offense that the identity of each predicate act must be agreed upon unanimously by the jury; or whether the identities of the predicate acts are merely alternative means of committing the same CCE offense or preliminary facts required to establish the offense, such that unanimity is not required under the Supreme Court's decision in Schad v. Arizona, 501 U.S. 624 (1991).

The plain reading and meaning of the CCE statute does not require the identification of the particular predicate acts as an element of the CCE offense. Therefore, the jury need not have unanimously agreed on the same three predicate acts constituting the "continuing series" in convicting Edmonds of CCE. Accordingly, the district court did not err in failing to give such a specific unanimity instruction.

## A.

20

In order for the government to make out the offense of conducting a continuing criminal enterprise, as defined by 21 U.S.C. § 848(c), it must show that:

(1)  the defendant committed a drug-related felony, 21 U.S.C. 848(c)(1);

(2)  the felony was "a part of <u>a continuing series of violations</u>" of the drug laws;  21 U.S.C. § 848(c)(2) (emphasis added);

(3)  the defendant undertook that drug-related felony "in concert with five or more other persons with respect to whom [the defendant] occupied a position of organizer, a supervisory position, or any other position of management," 21 U.S.C. § 848(c)(A);  and

(4) the defendant obtained substantial income or resources from these violations.  21 U.S.C. §848(c)(B).

The district court had instructed the jury that "[a] continuing series of violations requires proof beyond a reasonable doubt that three or more violations occurred and that they, those three or more, were related to each other."  App. 577.  The district court also instructed the jury that "[y]ou are asked to deliberate with a view towards reaching a unanimous decision with respect to each count and each defendant charged here in this indictment."  App. 581.  The only issue before us on appeal is whether the district court erred in failing to instruct the jury that in order to convict Edmonds of engaging in a CCE, it must unanimously agree as to which three predicate acts constituted the "continuing series of violations" under the CCE statute.

Nowhere in the language or legislative history of the CCE statute does Congress evince a concern regarding the particular

21

nature or identity of the predicate acts constituting the "continuing series of violations." Aside from requiring that the "violations" be drug-related offenses, Congress has not imposed limits on what predicate acts constitute a "violation." The courts, at liberty to define this statute, have generally held that "violations" refer broadly to offenses, including unindicted offenses, whether or not they led to convictions. See United States v. Rosenthal, 793 F.2d 1214, 1226-27 (11th Cir. 1986), cert. denied, 480 U.S. 919 (1987); United States v. Markowski, 772 F.2d 358, 361-62 (7th Cir. 1985), cert. denied, 475 U.S. 1018 (1986). Congress has not even defined the number of predicate acts required to form a "series." Thus, while some courts of appeal have required three predicate acts, see United States v. Echeverri, 854 F.2d 638, 642 (3d Cir. 1988); United States v. Rosenthal, 793 F.2d 1214, 1226 (11th Cir. 1986), cert. denied, 480 U.S. 919 (1987), another court has required only two. See United States v. Canino, 949 F.2d 928, 947 (7th Cir. 1991), cert. denied, 504 U.S. 910 (1992).

Indeed, the statute itself does not require that the violations be "related," although the courts have uniformly read such a "relatedness" requirement into the definition of "continuing series." See e.g. United States v. Rodriguez-Aguirre, -- F.3d --, 1996 WL 8119, *4 n.3 (10th Cir. 1996).

B.

The broadness with which Congress defined a "continuing series of violations" indicates that the exact identities of the predicate offenses necessary for a jury to find a "continuing

22

series" for purposes of the CCE statute are not essential facts constituting an element of the offense. Rather, the predicate offenses are no more than alternative means of, or preliminary facts, establishing the element of "continuing series." In Schad v. Arizona, 501 U.S. 624, 633 (1991), the Supreme Court held that facts that constitute merely alternative means of, or preliminary facts to, proving a single offense need not receive the unanimous agreement of the jury.

In Schad, a plurality of the Supreme Court held that the jury was not required to unanimously agree on whether the defendant Schad had committed premeditated murder or felony-murder in order to convict him under the Arizona first-degree murder statute. That statute provided that first-degree murder was only one crime, regardless of whether it occurred as a premeditated murder or a felony murder. The Supreme Court stated that:

> Our cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed. . . . We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictment were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."

Id. at 631-32 (quotation omitted). Thus the Court rejected requiring jury unanimity on the "mere means of satisfying a

23

single element of an offense," noting that such a requirement would lead to "absurd results."  Id. at 636 n.6.

The Schad Court recognized that there were due process limits to the state's authority to define what facts constitute merely alternative means of committing a single offense.  The Court stated that:

> [N]othing in our history suggests that the Due Process Clause would permit a State to convict anyone under a charge of "Crime" so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction.

Schad, 501 U.S. at 63.  There comes a point, the Court recognized, when "differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses." Schad, 501 U.S. at 633.  In the case of the Arizona murder statute, the Court held that due process was not violated because the state legislature had determined that premeditated murder was "morally equivalent" to felony murder.  Id. at 644.

In the present case, the CCE statute clearly provides for conviction for engaging in a CCE regardless of the identity, level of seriousness, or differing penalties of the predicate acts constituting the "continuing series of violations."  Because any grouping of multiple related drug offenses will satisfy this element of the statute, and because different groupings of predicate acts do not define separate crimes, the identities of the specific predicate acts constituting the "continuing series"

24

do not rise to facts so "indispensable to proof of a given offense," Schad, 501 U.S. at 633, that they must be agreed to unanimously by the jury. If we were to hold otherwise, we would in effect be establishing a rule requiring jury unanimity as to every predicate fact underlying the second prong of the CCE statute. Indeed, the majority opinion has furnished us with no explanation as to how its analysis can result in a conclusion that Congress intended just this one prong of a four-prong statute to require jury unanimity as to the identity of the three predicate acts and not require jury unanimity as to the factual underpinnings of the other components of the CCE.

Certainly, the majority opinion has furnished us with no clue as to why just this requirement of the CCE statute ("continuing series of violations") must be distinguished from the other three requirements of the statute.

While the first CCE prong (commission of a drug-related felony) requires only a single determination, the other three CCE prongs cannot be satisfied by a single determination and they therefore potentially raise unanimity issues. If the majority's analysis is correct, then it would inexorably follow that all five or more individuals - the subject of the third CCE prong - must likewise be identified and agreed upon by each member of the jury. Yet we have held, and the majority apparently agrees with that holding, (Maj. Op. at 25), that this is not required. See United States v. Jackson, 879 F.2d 85 (3d Cir. 1989) (unanimity on five or more supervised individuals not required).

25

Similarly, and just as illogically under the majority's analysis, with respect to the CCE requirement that a defendant must have derived "substantial income or resources" from his drug violations, it would appear that the majority would also require unanimity as to the factual findings and identities of such income or resources. Would the jury have to identify the cash, property, airplanes, automobiles (Mercedes, Lexus, BMW), yachts, etc. and agree unanimously on the particular resource which the defendant received?

Such a construction – singling out and selecting one of four statutory requirements and interpreting an unarticulated congressional intent requiring unanimity only with respect to that one prong of a four-prong statute – is not supported by any precedent, any logic, or any reason. Nor can the majority's unsupported argument, that such a construction is mandated, supply that authority. In sum, "'there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'" Schad, 501 U.S. at 632 (quoting McKoy v. North Carolina, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring)).

C.

Not requiring specific unanimity on the predicate acts constituting the "continuing series of violations" is consistent with our holding in United States v. Jackson, 879 F.2d 85 (3d Cir. 1989), where we held that there need not be unanimous agreement among the jury as to the identities of the five or more persons making up the group of underlings supervised, organized,

26

or managed by the defendant for purposes of the CCE statute.[31]

The majority attempts to distinguish <u>Jackson</u> by arguing that the five-person requirement, unlike the continuing series requirement, has a "historical analogue in the law of conspiracy, which generally has not required the jury to unanimously agree on the identity of the defendant's co-conspirators." (Maj. Op. at 25). The applicability of the law of conspiracy to substantive CCE offenses is open to question. Moreover, even if the law of conspiracy were applicable here, it is clear that the continuing series requirement enjoys as much of a "historical analogue" as does the five-person requirement. Notably, in the case of a multiple-object conspiracy, a jury need not unanimously agree as to which object of the various charged objects forms the basis for their conviction of a defendant for conspiracy. <u>See</u>, <u>e.g.</u>, <u>United States v. Linn</u>, 31 F.3d 787, 991 (10th Cir. 1994); <u>United States v. Peral-Cota</u>, 1993 WL 68934, *4 (9th Cir. 1993).[32]

_____

[31]At least seven other circuits have not required unanimity with respect to the identity of the five underlings in the CCE statute. <u>See</u> <u>United States v. Jelinek</u>, 57 F.3d 655, 658 (8th Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 236 (1995); <u>United States v. Harris</u>, 959 F.2d 246 (D.C. Cir.), <u>cert. denied</u>, 506 U.S. 932 (1992); <u>United States v. Canino</u>, 949 F.2d 928 (7th Cir. 1991), <u>cert. denied</u>, 504 U.S. 910 (1992); <u>United States v. Moorman</u>, 944 F.2d 801 (11th Cir. 1991) (per curiam), <u>cert. denied</u>, 503 U.S. 1007 (1992); <u>United States v. English</u>, 925 F.2d 154, 159 (6th Cir.), <u>cert. denied</u>, 501 U.S. 1211 (1991); <u>United States v. Linn</u>, 889 F.2d 1369, 1374 (5th Cir. 1989), <u>cert. denied</u>, 498 U.S. 809 (1990); <u>United States v. Tarvers</u>, 833 F.2d 1068, 1074 (1st Cir. 1987).

[32]Indeed, as the Supreme Court has held, "[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." <u>Griffin v. United States</u>, 502 U.S. 46, 56-57 (1991) (quoting <u>Turner v. United States</u>, 396 U.S. 398, 420 (1970)).

27

The majority also argues that <u>Jackson</u> is distinguishable because "acting in concert with one group of five people is no more or less blameworthy than acting in concert with another group of five." (Maj. Op. at 26). However, as discussed <u>infra</u>, the CCE statute clearly provides that engaging in one group of related predicate acts is as equally blameworthy as engaging in another group of related predicate acts. Just as the exact identities of the five supervised individuals are preliminary factual findings or mere alternative means to proving a CCE offense, the exact identities of the predicate acts constituting the "continuing series of violations" are also preliminary factual findings or mere alternative means to proving a CCE offense and thus need not be the subject of jury unanimity. <u>See</u> <u>United States v. Anderson</u>, 39 F.3d 331, 350-51 (D.C. Cir. 1994) (holding that the district court's failure to instruct the jurors that they were required to agree unanimously on the particular predicate acts committed and the identities of the five individuals managed in order to convict the defendant for violation of the CCE statute was not plain error), <u>cert. denied</u>, 116 S. Ct. 542 (1995); <u>United States v. Canino</u>, 949 F.2d 928, 948 (7th Cir. 1991) (holding that juror unanimity was not required on the identities of the predicate offenses constituting the "continuing series" because "[t]he constitutional requirement of juror unanimity in federal criminal offenses is satisfied when each juror in a CCE trial is convinced beyond a reasonable doubt

28

that a defendant charged under the CCE statute committed two predicate offenses."), <u>cert. denied</u>, 504 U.S. 910 (1992).[33]

### D.

The district court's general unanimity instruction sufficiently ensured that the jury would unanimously agree that a "continuing series of violations," that is, three or more related drug offenses, occurred. Thus, I find that the district court committed no error when it did not provide a specific unanimity instruction.

### II.

Today, the majority purports to "affirm" or "reaffirm" our decision in <u>United States v. Echeverri</u>, 854 F.2d 638 (3d Cir. 1988). The majority, conceding that neither the language nor legislative history of the CCE statute requires specific unanimity, strains to justify its position by resorting to "background interpretive principles," including the "tradition in criminal jurisprudence," constitutional considerations, and the rule of lenity. In my view, these "background interpretive

---

[33]<u>See also</u> <u>United States v. Kramer</u>, 955 F.2d 479, 486–87 (7th Cir. 1992) (rejecting defendants' contention that the jury should have been instructed that it must unanimously agree as to each of the two or more predicate offenses constituting the "continuing series" of CCE, where the court had given a general unanimity instruction), <u>cert. denied</u>, 506 U.S. 998 (1992); <u>United States v. Hernandez-Escarsega</u>, 886 F.2d 1560 (9th Cir. 1989) (specific unanimity instruction not required where the jury had convicted the defendant of two the eleven predicate offenses alleged in the CCE count, and where there was "overwhelming" evidence at trial that the other charged predicate acts had occurred), <u>cert. denied</u>, 497 U.S. 1003 (1990).

29

principles" cannot support the ambitious proposition for which they are invoked by the majority.

A.

First, the majority argues that under the "general historical tradition in criminal jurisprudence," "[c]riminal trials have long ensured substantial jury agreement as to the facts establishing the offense." (Maj. Op. at 18). In so arguing, the majority glosses over and fails to answer the central dilemma in the case: how we are to determine which facts require or do not require unanimous jury agreement.

Clearly, not all of the facts underlying a verdict require jury unanimity. See Schad, supra. In failing to define what "facts" require jury unanimity or not, the majority's argument does not supply a satisfactory, authoritative, or logical answer as to whether the identities of the three predicate acts constituting a "continuing series of violations" for purposes of CCE require jury unanimity.

B.

Next, the majority argues that "[t]here is a real possibility that the CCE statute would violate the Due Process Clause absent a specific unanimity requirement." (Maj. Op. at 19). The majority, however, cannot find a principled way to argue that due process was violated in this case when it was not violated in Schad.

In Schad, the Supreme Court held that the Due Process Clause was not violated when the defendant was convicted of first-degree murder despite the lack of assurance that the jury unanimously

30

agreed as to whether the defendant had committed premeditated murder or felony murder. The majority argues that this result was defensible in Schad only because premeditated murder and felony murder are of "equivalent blameworthiness or culpability" (Maj. Op. at 20 (quoting Schad, 501 U.S. at 643)); and that in the present case, the three predicate offenses may vary greatly in degrees of seriousness which would cause them to not be equivalently blameworthy.

This argument lacks any basis in logic. To the extent that the CCE statute allows conviction for the same offense based on any grouping of multiple related predicate acts, despite the fact that each act may carry very different penalties, this is a decision that has already been made by Congress. In other words, Congress has already determined that regardless of the exact identity or seriousness of the predicate acts constituting the "continuing series," a defendant is equally blameworthy so long as he has engaged in multiple related drug-related offenses. As the Supreme Court noted in Schad, "'the . . . legislature's definition of the elements of the offense is usually dispositive.'" Schad, 501 U.S. at 639.

A legislature's definition of the elements of an crime does not offend constitutional strictures where such definition is supported by "history" and "shared practice." See Schad, 501 U.S. at 640. As discussed earlier, Congress's decision not to require unanimity on the identities of the predicate acts for a CCE offense finds a historical analogue in the well established law that where an indictment alleges multiple acts charged in the

31

conjunctive, the jury need only be given a general unanimity jury instruction, and a general guilty verdict suffices to convict the defendant.  See, e.g., United States v. Linn, 31 F.3d 787, 991 (10th Cir. 1994);  United States v. Peral-Cota, 1993 WL 68934, *4 (9th Cir. 1993).

Moreover, a specific unanimity instruction to the jury would do nothing to change the fact that a defendant could be convicted for CCE regardless of whether the jury found that he engaged in a series of first-time simple possession offenses or whether the jury found that he engaged in a series of more serious crimes such as distributing large quantities of drugs.[34]

Accordingly, because Congress has already determined that any "continuing series of [drug] violations," regardless of the identity or seriousness of those drug violations, is equally blameworthy for purposes of CCE, we defer to Congress's determination as the Court deferred to the Arizona legislature's intent in Schad.  The majority's argument that the predicate acts making up such a "continuing series" may vary in degrees of seriousness is irrelevant, and Edmonds' conviction for CCE, even if based on less than unanimous jury agreement as to which three

---

[34]I raise this point not to "suggest[] that the equivalent blameworthiness test is a pointless exercise," (Maj. Op. at 22), but to highlight the fact that the majority's criticism of the CCE statute would not be cured by the specific unanimity instruction requested on the appeal before us.  Indeed, the majority's "equal blameworthiness" argument does not provide support for a specific unanimity instruction but instead stands as a challenge to the facial constitutionality of the CCE statute.

32

predicate acts constituted the "series," does not violate due process.[35]

## C.

Finally, the majority also argues that requiring specific unanimity is "counseled" by the rule of lenity.

First and foremost, the rule of lenity applies only when a statute is ambiguous and, in light of the traditional view that unanimity is required only as to the general verdict, the CCE statute cannot be deemed ambiguous.

Moreover, as the majority acknowledges, there is no authority for applying the rule of lenity to the issue posed in the present case. Nevertheless, the majority argues that the rule of lenity should apply here because it has been applied to the "conceptually analogous situation: whether a single criminal act constitutes one or more violations of a statute." (Maj. Op. at 22). I fail to see, however, how the issue of whether a single criminal act constitutes one or more violations of a statute is at all analogous to the present issue of whether the facts sought to be proven at trial are or are not so essential to proof of an element of the offense such that jury unanimity is or is not required.

---

[35]The majority also notes for the first time in the harmless error section of its opinion, that the Sixth Amendment is also "implicated" by the district court's failure to give a specific unanimity instruction in this case. (Maj. Op. at 27). However, as the majority concedes, the present inquiry turns not on Sixth Amendment concerns but Due Process concerns. (Maj. Op. at 27 n.11).

33

The majority also invokes a number of cases for the proposition that the rule of lenity requires fair warning as to the harshness of criminal penalties for a given offense. From there, the majority makes the tenuous connection that because procedural protections affect the likelihood that a penalty will be imposed, that "[a]t some point, differences in procedural protections become as significant as different penalties, and the need for fair warning just as critical." (Maj. Op. at 24).[36] This argument is forced and fails to persuade. The "procedural protections" at trial may affect the likelihood that a defendant will be convicted at trial (a jury question), but this is a separate issue from what penalties will be imposed (a statutory and/or judicial matter).

## III.

Because Congress has not required specific unanimity with respect to any of the predicate factual findings underlying the CCE statute, and because there is no basis for our requiring unanimity as to the identities of the predicate acts when we do not require unanimity as to the identities of the five supervised individuals, or as to the identities of the defendant's income and resources; I would overrule Echeverri. Instead I would hold that, absent Congressional intent requiring jury unanimity as to the identity of predicate factual findings, a specific unanimity instruction on a statute's predicate findings is not required.

---

[36]Presumably, the "procedural protection" that the majority has in mind is a specific unanimity instruction to the jury.

34

Because there was no error committed by the district court, I would not reach the issue of harmless error.  Although I concur in the ultimate result reached by the majority in sustaining Edmonds' conviction, I respectfully dissent from the majority's holding that requires unanimity as to the identities of the predicate acts constituting the "continuing series" prong of the CCE statute.